**Harold E. CARTER, Appellant,**

v.

**William BENNETT, Secretary, U.S. Department of Education.**

**No. 87–5098.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 25, 1987.

Decided Feb. 19, 1988.

As Amended Feb. 19, 1988.

John L. McGann, Arlington, Va., for appellant.

Daniel Bensing, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., Royce C. Lamberth (at the time the brief was filed) and R. Craig Lawrence, Asst. U.S. Attys., and William Haubert, Atty., Dept. of Educ., Washington, D.C., were on the brief, for appellee.

Before WALD, Chief Judge, BORK *, Circuit Judge, and GASCH **, Senior District Judge, United States District Court for the District of Columbia.

Opinion for the Court filed by Chief Judge WALD.

WALD, Chief Judge:

Harold E. Carter brought this action against the Department of Education (DOE or Department) in the District Court for the District of Columbia. Carter alleged that the Department did not reasonably accommodate his handicap (blindness) as required by the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, and that it retaliated against him for filing an Equal Employment Opportunity (EEO) complaint, in violation of Title VII of the Civil Rights Act of 1964, § 704(a), 42 U.S.C. § 2000e–3(a). The district court, after a two-day trial, found in favor of the Department on both counts. We affirm the district court.

## I. BACKGROUND

The facts as found by the district court are as follows. In May 1977, Carter, who is legally blind, was hired by the then Department of Health, Education and Welfare (HEW) as a public affairs assistant with the Office of Civil Rights (OCR). When certain functions of HEW were moved to the newly established Department of Education in 1980, Carter was transferred to the same position in the new Department; there he became part of the Special Concerns Staff within the OCR. *See* Transcript (Tr.) at 76. Although Carter was

originally hired primarily to transcribe printed matter into Braille, he was given different responsibilities upon his transfer; from late 1981 until his termination in August 1982, Carter's duties consisted of analyzing and answering correspondence directed to the OCR from members of Congress and the public. *See Carter v. Bennett,* 651 F.Supp. 1299, 1300 (D.D.C.1987).

In May 1981, Carter filed an EEO complaint alleging that the DOE had not reasonably accommodated his handicap as required by the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* In March 1982, Carter received a notice from his supervisor stating that his job performance and attitude were unsatisfactory and advising him that he had 30 days to improve or face termination. Four months later, Carter received a notice of "Decision to Remove." In June and July of 1982 appellant filed another three complaints with the Department's EEO office, alleging that the Department had violated Title VII of the Civil Rights Act, 42 U.S.C. § 2000e–3(a), by retaliating against him for filing his original discrimination complaint. In October 1985, appellant filed suit in the district court regarding his four complaints. The district court found that Carter was provided reasonable accommodations for the performance of his duties and that he was discharged for nondiscriminatory reasons. This appeal followed. *See* Appellee's Brief at 1–2.

## II. STANDARD OF REVIEW

Although this Court is bound by the "clearly erroneous" standard of Federal Rule of Civil Procedure Rule 52 in reviewing the district court's findings of fact, the ultimate question of whether the government provided "reasonable accommodation" to the appellant's handicap is not a question of pure fact but a mixed question of law and fact. In *Pullman–Standard v. Swint,* 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982), the Supreme Court described "questions in which ... the issue is whether the facts satisfy the statutory

---

\* Circuit Judge Bork was a member of the panel that heard this appeal but did not participate in the decision.

\*\* Sitting by designation pursuant to 28 U.S.C. § 294(d).

standard" as mixed questions of law and fact. *Id.* at 289 n. 19, 102 S.Ct. at 1790–91 n. 19; *cf. Southern Ry. v. Tift,* 206 U.S. 428, 429, 27 S.Ct. 709, 709, 51 L.Ed. 1124 (1907) (whether a rate is reasonable is a question of "fact mixed with law"); *United States v. Nates,* 831 F.2d 860, 862 (9th Cir.1987) (Fourth Amendment "reasonable cause" is a mixed question of law and fact); *Kennedy v. Josephthal & Co.,* 814 F.2d 798, 803 (1st Cir.1987) (citing *Cook v. Avien, Inc.,* 573 F.2d 685 (1st Cir.1978)) (question of reasonable diligence is factually based but gives rise to mixed question of law and fact); *Blitz v. Donovan,* 740 F.2d 1241, 1244 (D.C.Cir.1984) (district court determination in EAJA case regarding reasonableness of government's litigation position is subject to *de novo* review). In the present case, we are reviewing not just the district court's factual findings as to the nature of Carter's job and the particular accommodations provided him but its conclusion of law that those accommodations were "reasonable" under the Rehabilitation Act. While the district court's factual determinations may not be set aside unless "clearly erroneous," the legal conclusion that the Department's actions were adequate to satisfy the mandate of the Act is subject to more rigid appellate scrutiny. *See, e.g., Pullman–Standard,* 456 U.S. at 287, 102 S.Ct. at 1789; *Inwood Labs. v. Ives Labs.,* 456 U.S. 844, 855 n. 15, 102 S.Ct. 2182, 2189 n. 15, 72 L.Ed.2d 606 (1982); *United States v. Weisz,* 718 F.2d 413, 429 (D.C.Cir.1983), *cert. denied,* 465 U.S. 1027, 104 S.Ct. 1285, 79 L.Ed.2d 688 (1984).

### III. THE LAW

█ Federal employers are obliged by § 501(b) of the Rehabilitation Act, 29 U.S.C. § 791(b), to provide reasonable accommodation for the handicapped. *See Prewitt v. United States Postal Service,* 662 F.2d 292, 307 (5th Cir.1981). Indeed, the legislative history of § 501 "demonstrates that Congress intended that the federal government be a model employer of the handicapped." *Gardner v. Morris,* 752 F.2d 1271, 1280 (8th Cir.1985) (citing 29 C.F.R. § 1613.703). As the Supreme Court has noted, § 501 "expressly requires feder-

al employers to develop affirmative action programs on behalf of handicapped persons." *Id.* (citing *Southeastern Community College v. Davis,* 442 U.S. 397, 410, 99 S.Ct. 2361, 2369, 60 L.Ed.2d 980 (1979)). More specifically, § 501 of the Rehabilitation Act imposes on federal agencies "an affirmative duty 'to structure their procedures and programs so as to ensure that handicapped individuals are afforded equal opportunity in both job assignment and promotion.'" *Id.* (quoting *Ryan v. Federal Deposit Ins. Corp.,* 565 F.2d 762, 763 (D.C.Cir.1977)). The Rehabilitation Act, however, contains a caveat: the 1978 amendments expressly provide that the district courts may "take into account the reasonableness of the cost of any necessary work place accommodation" in fashioning remedies for violations of § 501. 29 U.S.C. § 794a(a)(1).

The EEOC promulgated extensive regulations to guide federal employers in making reasonable accommodations for handicapped persons.

(a) An agency shall make reasonable accommodation to the known physical or mental limitations of a qualified handicapped applicant or employee unless the agency can demonstrate that the accommodation would impose an undue hardship on the operation of its program.

(b) Reasonable accommodation may include, but shall not be limited: (1) making facilities readily accessible to and usable by handicapped persons, and (2) job restructuring, part-time or modified work schedules, acquisition or modification of equipment or devices, appropriate adjustment or modification of examinations, the provision of readers and interpreters, and other similar actions.

29 C.F.R. § 1613.704 (1986).

In cases in which a handicapped plaintiff sought but was denied a position with the federal government, courts have held that the initial burden is on the plaintiff to make a *prima facie* showing that reasonable accommodation of his handicap is possible. Once the plaintiff makes such a showing, the employer bears the burden of demonstrating inability to accommodate. Credible evidence that reasonable accommodation is not possible or would be unduly

burdensome shifts the burden back to the plaintiff to rebut the employer's evidence. *See Gardner,* 752 F.2d at 1280; *Treadwell v. Alexander,* 707 F.2d 473, 478 (11th Cir. 1983); *Prewitt,* 662 F.2d at 308 (citing Note, *Accommodating the Handicapped,* 80 Colum.L.Rev. 171, 187–89 (1980)).

The situation here is somewhat different. The plaintiff in this case was not denied a job he sought; rather, the government not only hired Carter initially but made the decision to transfer him to the new position from which it subsequently discharged him for failing to perform adequately. Of course the government might have, but did not, show(n) that it had assigned Carter to his new job when his old one was abolished, only after finding that there were no suitable alternative jobs to which he could be transferred; in this case, the government would not have a duty to prove that the plaintiff's new job was suitable for a handicapped person. In the absence of such a showing, it is the government's burden to prove that Carter's new job could have been performed by a person with his handicap, if reasonably accommodated, and that such accommodation was in fact provided.

## IV. THE LAW APPLIED IN THIS CASE

### A. *Whether Carter's Handicap Could Have Been Reasonably Accommodated In His New Job*

■ The district court concluded that the Department "has met its burden of persuasion with evidence that it reasonably accommodated plaintiff's handicap." *Carter,* 651 F.Supp. at 1301. Implicit in this conclusion is the factual finding that the Department did not assign Carter to a position in which it was impossible to reasonably accommodate a visually handicapped person. We review this finding under the clearly erroneous standard.

The nature and requirements of Carter's job were not disputed. The parties agreed that answering congressional inquiries in this instance required considerable techni-

cal knowledge of three civil rights statutes and of "the implementing regulations and the implementing policy directives." Tr. at 160. The government conceded that "Mr. Carter did not have a fundamental understanding of [those] basic statutory provisions." *Id.* It was also undisputed that answering congressional correspondence requires considerable research into regulatory guidelines and letters of noncompliance; it also involves drafting and revising replies and in the process incorporating verbal and written suggestion from others in the office. *See id.* at 46–47. The district court implicitly found that with the assistance of readers or other accommodations, a visually handicapped person would be capable of performing these functions.[1]

Carter now challenges this finding, based on both his own testimony at trial and the testimony of his former supervisor. Specifically, Carter testified that he was the only blind person in the OCR charged with answering congressional correspondence and that even if he were provided with a full-time reader and extensive equipment (which in his estimation would case $65,000–$70,000), he still could not be as efficient as a sighted person in performing the duties expected of him. *See id.* at 100. According to Carter, he could only do satisfactory research if all the materials were written in Braille—and they were not. In his words: "There is no way that you can interpret subtle thoughts to a reader who is doing research.... To delve seemingly with no direction into files to get information—I don't know how you could do it unless you can see enough to do it yourself." *Id.* Norma Mohr, Carter's former supervisor, corroborated Carter's opinion. She explained:

[The congressional mail] required research through the files, ... it involves consulting the guidelines, letters of noncompliance.... Some preliminary research is typically required before you can give a sensible answer.... The other thing is ... the letter takes a trip

---

1. During Carter's testimony at trial, the district court judge stated:

So initially, if I understand you correctly, the only thing you needed was a reader, which you didn't get?.... And then somewhere

along the line you didn't get enough work, which is not unusual in the federal bureaucracy, and toward the end you needed some more specialized equipment.

Tr. at 126–27.

down the corridors from office to office and notes are put in the margins, so the letter writer must come back with his original draft and see these notations and make decisions, and perhaps incorporate them, ... I don't think a visually handicapped person could do this in a timely way.

*Id.* at 46. The record, however, also contains evidence that conflicts with the testimony of Carter and Ms. Mohr. Dale Pullen, Carter's supervisor for most of the period covered by the complaint, testified that although he agreed that Carter "was improperly placed on the Special Concerns Staff," in his view Carter was perfectly capable of answering congressional correspondence. *Id.* at 242. According to Pullen, Carter's letters were primarily "issue-oriented" and "less than routine"; no legal analysis was required for 95% of his work. *Id.* at 223–24. Pullen testified that Carter needed only "very basic skills," such as making phone calls within the office to obtain information and inserting "boilerplate language" into form letters. *Id.* at 225.

The district court apparently credited the government's testimony on Carter's ability to perform the functions of answering congressional correspondence over the testimony offered by Carter's witnesses. The district court's credibility determinations are entitled to the greatest deference from this court on appeal. *See, e.g., Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). "When a trial judge's finding is based on his decision to credit the testimony of one or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." *Anderson v. Bessemer City,* 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985). Because we cannot second-guess the trial court's credibility determinations, and because we are not "left with the definite and firm conviction that a mistake has been committed," we uphold the finding below that Carter was not assigned to a position in which it was impossible for him to be reasonably accommodated.

**B.** *Whether The Department Reasonably Accommodated Carter*

■ Next, we consider whether the district court properly concluded that the Department satisfied its burden of proving that it reasonably accommodated Carter's handicap. We have no quarrel with the district court's factual determinations that the Department "provided persons to act as readers for plaintiff, it furnished special equipment and office space, and it decreased plaintiff's workload," *Carter,* 651 F.Supp. at 1301; these findings are amply supported by the record. Nor do we disagree with the district court's formulation of the applicable legal standard in this case; although "[t]he government is not obligated under the statute to provide plaintiff with every accommodation he may request," the government must, at a minimum, provide "reasonable accommodation as is necessary *to enable him to perform his essential functions." Id.* at 1301 (emphasis added). Rather, our concern is whether the district court, in applying the appropriate legal principles to the particular facts of this case, could properly find that the accommodations provided by the Department made it possible for Carter to perform his essential responsibilities. As we discussed above, our review of this application of law to fact is not limited by the clearly erroneous standard.

Carter testified that during the period covered by the complaint, he had only two part-time readers, who together spent a total of 18 hours a week (approximately 3.5 hours a day) with him; that neither of those readers was selected by Carter, that Carter repeatedly told his supervisors that his readers "could not read" and "didn't have the skills necessary"; and that it was not until April 1982 that he was given a reader of his choice. *See* Tr. at 77, 83, 84. On the other hand, Carter conceded at trial that he never told his readers that they were not satisfactory or made any suggestions as to how they could improve their services. *See id.* at 116–17. Furthermore, in a memorandum to the acting director of the Special Concerns Staff dated August 27, 1981, Carter himself stated that in or-

**68**

der to perform his duties, he needed "a reader to work a minimum of 20 hours per week"—only a few more hours of reader time than the amount he actually received. *See id.* at 211. Moreover, Carter's supervisor Pullen testified that the personnel office, at his request, immediately made efforts to secure for Carter a full-time reader "that [Carter] had some say in selecting," and that although Carter did not get a reader of his choice until April 1982, he "had access to anybody in the office" in the meanwhile, since the entire Special Concerns Staff had been asked to be "available to Mr. Carter any time he needed some help reading." *Id.* at 228–33. In addition, the record indicates that even after Carter was provided with the reader of his choice, his supervisors continued to find his work unsatisfactory and, in June 1982, recommended that he be discharged. *See id.* at 274. Finally, while other people in the OCR were drafting up to 12 letters per week, Carter's workload was reduced to half that amount, 6 letters per week.[2] *See id.* at 248.

Based on this evidence, the trial court concluded that the government had reasonably accommodated Carter and that Carter had not substantiated his contention that the additional accommodations he requested—including a voice synthesized computer and two floppy disk drives—were necessary for adequate performance of his job. *See* Tr. at 98. To be sure, a reader of the record may be somewhat perplexed as to why the Department would assign Carter to a job that was so research and reading-intensive in the first place and then delay in providing Carter with full-time readers. Nonetheless, the district court could reasonably conclude that the accommodations actually provided by the Department made it possible for Carter to perform his essen-tial duties. We therefore uphold the district court's ultimate finding that the Department did not fail to reasonably accommodate Carter in violation of § 501 of the Rehabilitation Act.

We also uphold the finding that the Department did not retaliate against Carter in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e–3(a). The record amply supports the district court's determination that Carter failed to prove that there existed a causal connection between his filing of the EEO complaint and the adverse employment action taken against him.

*Affirmed.*

---

**2.** The district court also found that the Department supplied Carter with "special equipment" as part of its reasonable accommodation. *Carter,* 651 F.Supp. at 1301. This "special equipment" consisted of a Visualtek machine, a tape recorder and a Braille typewriter. According to Carter, none of this equipment served as a reader-substitute, and most of Carter's duties as a congressional correspondent could not be performed without a reader. Moreover, Carter testified that the Visualtek, a machine designed to assist blind persons with some residual vision by magnifying print, was so poorly tailored to his needs that it was of virtually no use to him. Nearly all of the congressional mail Carter had to peruse was not typed but written in long-hand, which Carter, like many blind persons, had never been trained to read. The Viseualtek was thus of minimal assistance to Carter, since it simply enlarged print that he could not read. *See* Tr. at 68–70.