Donald BARTH, Plaintiff,

v.

Bruce S. GELB, et al., Defendants.

Civ. A. No. 89–2967.

United States District Court,
District of Columbia.

April 24, 1991.

David H. Shapiro, Katherine L. Garrett, Washington, D.C., for plaintiff.

Diane M. Sullivan, Asst. U.S. Atty., Washington, D.C., for defendants.

## MEMORANDUM

GESELL, District Judge.

This is an action by a "qualified handicapped person" alleging discrimination in violation of the Rehabilitation Act, 29 U.S.C. § 791, 791(a), as amended. Plaintiff Donald Barth is an insulin-dependent diabetic. He is an engineer and is presently Chief of the Field Support Section, Computer Services Division of the Voice of America ("VOA"), a component of the United States Information Agency ("USIA"). In 1988, he decided to change from this domestic civil service job and sought placement in the permanent Foreign Service of

the Department of State as a Foreign Service Specialist/Radio Engineer with VOA's overseas Radio Relay Station program. He was not selected, and the sole reason for his nonselection was his diabetic condition. Matters of first impression under the Act are presented by his discrimination claim, which has been vigorously contested. The case was tried to the Court over four days and post-trial briefs and proposed findings of fact and conclusions of law were submitted. The Court's findings of fact and conclusions of law follow.

## Background

VOA is the world-wide broadcasting arm of the United States government. It prepares programs in Washington, D.C., and broadcasts them world-wide by radio through a system of relay stations located around the world. The relay stations are managed by VOA Foreign Service Specialists.

In 1988, VOA had 12 overseas relay stations, located in Antigua; Belize; Botswana; Bangkok, Thailand; Colombo, Sri Lanka; Kavala, Greece; Liberia; Munich, Germany; the Philippines (3 sites); Quesada, Costa Rica; Rhodes, Greece; and Tangier, Morocco.

VOA's relay stations receive and transmit programs virtually 24 hours a day, 7 days a week, 52 weeks a year. They are staffed primarily by local citizens, known as Foreign Service Nationals. The entire corps of American relay station engineers overseas consists of approximately 70 Foreign Service Specialists spread over the twelve stations. These 70 employees staff five levels of positions at the various sites: station manager, deputy station manager, plant supervisor, assistant plant supervisor, and technician.

By the mid–1980s, there were many VOA station managers nearing retirement. Because of the highly specialized nature of these positions and the difficulties presented with prior classes recruited only from the VOA Civil Service who were unable to convert to the Foreign Service, VOA decided in 1988 to recruit technically qualified people directly into the Foreign Service and train them for four to six months at the VOA relay station in Greenville, North Carolina, before assigning them to overseas stations.

Mr. Barth, who was a VOA civil servant at the time, was one of 16 individuals selected from a larger group of applicants with a view to assignment overseas following the training period stateside. In addition to his technical training and VOA experience, he already had top security status. He was therefore qualified in all respects except that, like all applicants initially so selected, his selection was subject to medical clearance for himself and his wife. See 29 U.S.C. § 3901(a)(4); 3 State Department Foreign Affairs Manual § 684.7. As part of these standard medical clearance process, Mr. Barth underwent a physical examination performed by his own doctor, in this case his endocrinologist, Dr. Michael F. Ball.

Because Mr. Barth's health made him unable to satisfy the statutory requirement that he be available for world-wide foreign service, 22 U.S.C. § 3901(a)(4), the State Department Office of Medical Services ("State Med") denied him clearance automatically after a review of his condition by Dr. Sam Zweifel, then the Assistant Medical Director for Medical Clearances of the Department of State. Insulin-dependent diabetics are not considered available for world-wide service and State Department regulations apparently so provide.[1]

Mr. Barth does not challenge this initial denial of world-wide clearance (Tr. 6). Rather, he took advantage of a subsequent waiver process, and it is the VOA's denial of a medical waiver that is the bone of contention here.

Agencies such as VOA that employ Foreign Service personnel have established procedures for granting a waiver of medical clearance for entry into one of their

1. Dr. Zweifel testified to the existence of such a regulation, Tr. 270–71, although it was never provided or cited to the Court.

specific programs to an individual denied world-wide medical clearance by State Med. A waiver panel is convened to consider each application. A State Med doctor advises the waiver panel, but VOA has authority to grant waivers even without the concurrence of State Med. The actual decision is made by VOA's personnel director after considering the recommendation of the waiver panel.

Mr. Barth's waiver application was processed with particular vigor on his part in an effort to offset the strong adverse views of State Med. He submitted letters from three treating physicians, including Dr. Ball. However, the acting personnel director, Janice Brambilla, denied Mr. Barth a waiver of medical clearance on October 21, 1988. Prior to this decision, a panel consisting of John Welch, then Chief, VOA Foreign Service Personnel and Policy Division; Richard Belt, VOA Foreign Service Personnel Adviser; Edward Kulakowski, VOA Personnel Operations Staff; Lorie Nierenberg, Assistant General Counsel, USIA; and Fred Adams, VOA Office of Engineering and Technical Operations, had unanimously recommended denial after considering the matter over a period of time. Dr. Zweifel gave medical advice to the panel based on the medical information supplied by Mr. Barth. David Sites, from VOA's Engineering Office, and Helen Murphy, from USIA's Equal Employment Opportunity Office, also aided panel deliberations but, like Dr. Zweifel, did not vote.

Mr. Adams and Mr. Sites had each served at VOA relay stations abroad.

After exhausting all administrative review unsuccessfully, Mr. Barth filed this action.[2]

*The Issue*

■ The Foreign Service is fully subject to the requirements of the Rehabilitation Act.[3] The terms of section 791 of the Rehabilitation Act require each federal agency to maintain an affirmative action program for the hiring, placement and advancement of handicapped persons. The issues litigated in Rehabilitation Act cases turn largely not on this statutory provision but on the regulations issued thereunder, 29 C.F.R. sections 1613.701 *et seq.* Pursuant to the regulations, federal agencies must provide "reasonable accommodation" to "qualified handicapped persons" unless the agency can show that such accommodation would create "undue hardship" for the agency. *See Carter v. Bennett,* 840 F.2d 63 (D.C.Cir.1988).[4] The parties have stipulated that Mr. Barth is insulin-dependent, which is a physical impairment within the meaning of 29 C.F.R. § 1613.702(b), *i.e.,* a physiological condition affecting the endocrine system, and that he is a "qualified handicapped person" within the meaning of 29 C.F.R. § 1613.702(f), fully qualified if not for his handicap for a Radio Engineer Specialist position within the Foreign Service in the VOA Relay Station program.[5]

**2.** Mr. Barth testified that in January 1989 he applied for a two-year "excursion tour" as a VOA relay station worker abroad but that he got no response. *See* PX 36. Defendants claim they have no record of this application. The matter before the Court, as framed by Mr. Barth, is his application to the permanent foreign service, not his eligibility for any temporary foreign assignment. *See* Complaint ¶¶ 15, 17; Tr. 650.

**3.** Indeed, the Secretary of State is required by statute to ensure that members of the Service "are free from discrimination on the basis of ... handicapping condition," 22 U.S.C. § 3905(b)(1), and this Foreign Service nondiscrimination statute explicitly provides that it "shall not be construed to extinguish or lessen" rights provided by the Rehabilitation Act. 22 U.S.C. § 3905(e)(4).

**4.** The statute itself provides that a court "[i]n fashioning an equitable or affirmative action *remedy* [emphasis added] ... may take into account the reasonableness of the cost of any necessary work place accommodation...."

The new Americans With Disabilities Act of 1990, *see* Public Law 101–336 section 101, creates statutory definitions of the terms "qualified" handicap, "reasonable accommodation" and "undue hardship" that closely track the Rehabilitation Act regulations. The employment provisions of the new statute, however, are not applicable to the federal government. *See* § 101(5)(B)(i).

**5.** Section 1613.702(f) defines a "qualified handicapped" as "a handicapped person who, with or without reasonable accommodation, can perform the essential functions of the position in question without endangering the health and

■ The issue is whether VOA, in refusing to hire Mr. Barth as a Foreign Service Specialist, failed to provide him with "reasonable accommodation" as required by the Rehabilitation Act.

Mr. Barth contends that the VOA mishandled his waiver application and failed to make an accurate assessment of his condition, which could have been to reasonably accommodated without undue burden. He seeks back pay, training and assignment, preferably to the Munich, Germany, station, plus attorney fees.[6]

VOA urges the contrary and supports its position.

The respective contentions of the parties must be considered against the facts and circumstances developed before the waiver panel as expanded or qualified by the trial record.

Mr. Barth has the ultimate burden of proof.[7]

### Discussion

In determining whether VOA failed to reasonably accommodate Mr. Barth, the crucial regulation is 29 C.F.R. § 1613.704:

(a) An agency shall make reasonable accommodation to the known physical or mental limitations of a qualified handicapped applicant or employee unless the agency can demonstrate that the accommodation would impose an undue hardship on the operation of its program.

(b) Reasonable accommodation may include, but shall not be limited to: (1) Making facilities readily accessible to and usable by handicapped persons, and (2) job restructuring, part-time or modified work schedules, acquisition or modification of equipment or devices, appropriate adjustment or modification of examinations, the provision of readers and interpreters, and other similar actions.

(c) In determining pursuant to paragraph (a) of this section whether an accommodation would impose an undue hardship on the operation of the agency in question, factors to be considered include: (1) The overall size of the agency's program with respect to the number of employees, number and type of facilities and size of budget; (2) the type of agency operation, including the composition and structure of the agency's work force; and (3) the nature and the cost of the accommodation.

The issue for the Court is whether VOA's waiver denial decision met these standards. However, the evidence in this case showed that, instead of citing this regulation, VOA acted with reference to the State Department's Foreign Affairs Manual, section 684.7–5, which sets the standard for considering a waiver of medical clearance without regard to whether the waiver applicant meets the Rehabilitation Act standard of a "qualified handicapped person." The Foreign Affairs Manual permits waiver where the responsible personnel officer determines that:

(1) Overseas duty will not involve undue personal risk to the employee.

---

safety of the individual or others ..." In this case, it is not disputed that Mr. Barth is able to meet the regular on-the-job requirements of a Foreign Service Specialist and that it is only his diabetes that may prevent him from assignment to some of the relay station locations. *Compare Southeastern Community College v. Davis,* 442 U.S. 397, 406–11, 99 S.Ct. 2361, 2367–69, 60 L.Ed.2d 980 (1979) (more restrictive definition of "otherwise qualified" applied to federal government contractors and beneficiaries under the Rehabilitation Act than that applied to the federal government itself).

6. Section 794a of 29 United States Code codified a private right of action under the Rehabilitation Act by providing that the remedies, procedures and rights established in Title VII discrimination cases against the government, 42 U.S.C. § 2000e–16, are available in Rehabilitation Act cases.

7. The Court of Appeals has stated that in a Rehabilitation Act case claiming wrongful denial of a federal job, the plaintiff has the initial burden to make a prima facie showing that reasonable accommodation of his handicap was possible. The burden then shifts to the defendant to show inability to accommodate. Credible evidence in that regard shifts the burden back to the plaintiff. *Carter v. Bennett,* 840 F.2d at 65. By conclusion of the plaintiff's case the size and complexity of the record caused the Court to take the pro forma defense motion under advisement, and the Court herein assumes that a prima facie showing was made.

(2) Adequate medical skills and/or facilities exist and are available at the posts.

(3) The medical problem does not indicate the likelihood of substantial interruption to duty by excessive use of sick leave and/or undue cost for medical treatment/evacuation.

(4) The assignment abroad is in the interest of the Government.

Denial of waiver is not automatic by any means, as the Stipulations of the Parties demonstrates in summarizing experience from 1983 to 1990. For example, in 1987, five medical waivers for VOA applicants were sought and only one was denied. Waiver decisions must, however, take into account the wide variety of working conditions that a Foreign Service Specialist may encounter as well as the often limited number of positions available.

Of the 12 VOA relay stations overseas, all but two (Kavala and Munich) have tropical or semi-tropical climate. Malaria is a significant factor in Africa, and dysentery is prevalent in third-world countries. The stations in most instances are not in cities or near the U.S. Embassy but in more remote areas which are sparsely settled. State Med has only 37 doctors, about 42 nurses, 5 to 6 laboratory technologists, and 6 to 10 psychiatrists available to service some 250 locations around the world involving 35,000 Foreign Service employees and dependents. Small remote stations, like most VOA Relay Stations, are not served by government doctors, and local nationals must be relied on for medical care. Medical skills available in this fashion vary widely in accessibility, training and technical support. There are usually language difficulties to overcome. Inadequate medical services when medical emergencies arise can require transport from the station area by special charter or other sometimes costly arrangements improvised at the time. These conditions exist in varying degrees at most stations. Only Munich, Bangkok and the Philippines were con-

sidered by VOA as not having any of these problems affecting medical care.

A Foreign Service Specialist normally has a tour of duty that obliges him to serve at more than a single station. He or she must gain experience to move through the grades from technician to assistant plant supervisor, plant supervisor, deputy station manager to station manager. This is achieved, in part, by movement of specialists to different sites as vacancies develop [8] and also to meet emergency conditions requiring added manpower. Political developments or natural disasters at a particular site may force its suspension or closing, as has occurred in the past, requiring transfers on short notice. In the Philippines, for example, an earthquake shut off a station from outside help, and later a site was attacked by rebel forces. The station in Liberia was shut down and all personnel evacuated during the recent military conflict there. Specialists who have been highly trained on the job sometimes need to be transferred to meet temporary illness or for rest from stress that accompanies most assignments under the staffing and living conditions previously mentioned. It is obvious that flexibility of assignment is an essential feature of the program. As indicated, there are only 70 Specialist positions world-wide spread over the twelve stations. The stations have as few as three Specialists assigned, and, accordingly, management strives to promptly fill vacant posts.

It is a significant indication of working conditions that ultimate selection for permanent service is a protracted process not solved simply by a waiver. VOA Foreign Service Specialists are still known as "career candidates" during a three-to-five-year probationary period. Approximately one-third of trained Specialist career candidates for the Relay Station positions do not make it through their probationary period.

The physical working conditions and available medical resources were discussed by the panel in relation to Mr. Barth's ability to serve. The panel was aided by

---

**8.** Normally when a vacancy opens at one of the overseas posts, the VOA Foreign Service Specialists bid for it. Selection is made by VOA's Assignment Panel, based on qualifications, prior assignments, medical requirements, and family needs such as schooling for dependents.

information, not always precisely accurate but regularly updated and assembled by the Department of State, designed to record medical and technical assistance available at each Foreign Service post. It was apparent to the committee, as it was apparent to the Court after trial, that Mr. Barth required very prompt access to informed care if his condition suddenly changed due to infection or some other cause.

The panel was correctly advised that Mr. Barth's disease was one that becomes progressively worse, that his individual condition was already very complex, that he was prone to infection, which would raise blood sugar levels and necessitate close monitoring and attention within hours, that he would be endangered by stress and particularly by dehydration, and that, accordingly, the assignment to the program overseas would involve a serious risk for him. It is clear there was a thorough discussion of these and related matters. However, neither the discussions nor the particular reasons relied on for the panel's recommendation denying the waiver were recorded.

Mr. Barth has never contended, nor would it have been reasonable to do so, that "reasonable accommodation" required that VOA permanently assign a doctor and necessary facilities to be stationed with him as he moved from post to post. Instead, the focus of the trial and of the underlying VOA decision centered on the number of posts to which Mr. Barth could reasonably be sent without undue risk to himself given the medical facilities already available at the various sites. While a general rule of thumb favoring adaptability to at least 75 percent of posts was mentioned by several VOA officials, it was recognized that exceptions have been made for certain handicapped applicants, and in some instances a waiver has been granted where the waiver committee found there were adequate facilities at "the great majority" or even "a majority" of VOA overseas posts. (Stipulations 11–22, Tr. 206.)

Opinions differed to some extent among members of the waiver panel, and participants may have lacked precise current information as to some posts. The participants agreed that Mr. Barth's health needs could be met at the posts at Munich, Bangkok, and the Philippines. Other posts were more questionable. Dr. Zweifel felt that Colombo, Sri Lanka "might be acceptable" because of a particular competent doctor he knew there. There appears to have been a consensus that Mr. Barth might be available for at most five or six stations out of twelve.

While there is no adequate written record of the reasons for denial of the Barth waiver, there is no doubt about what occurred. The Committee unanimously recommended denial, and Ms. Brambilla, the acting personnel director, accepted the recommendation after interviewing some participants in the panel decision and speaking with Dr. Zweifel of State Med. During the trial she was extensively questioned about every aspect of her decision.

Mr. Barth was not waived because:

1. His disease was serious, complicated and subject to progressive deterioration.

2. He needs to have a doctor the same day in the event of any attack.

3. He could not tolerate conditions at at least half the posts, and conditions in some of the available posts could become more adverse. There was genuine concern that Mr. Barth would face life-threatening risks if assigned away from the three most suitable posts.[9]

4. The job involved more flexibility and wider availability than Mr. Barth could offer.

5. Individuals already employed who required reassignment because of illness contracted on the job needed postings to the more sanitary, less stressful posts, and mo-

---

**9.** Moreover, VOA's Director of Engineering and Technical Operations testified that for a person entering the Foreign Service at Mr. Barth's level, out of the three posts, there were no available positions in Munich or Bangkok, and only three in the Philippines at the time. Although he did not discuss this situation with Ms. Brambilla, he testified that Fred Adams, who conferred with the waiver board, would have been knowledgeable of available vacancies.

rale would suffer if these posts were permanently staffed by Specialists unable to work elsewhere.

In summary, the government's interest would not be served. The risks were great, and waiver in Mr. Barth's case was unfair to existing employees overseas because it would hamper the program. Both medical advice and advice from individuals with field experience received by Ms. Brambilla were unanimous to this effect.

The concerns of the Committee and the personnel officer who made the ultimate decision were genuine, not pretextual. Mr. Barth's medical condition was already complicated. He had experienced neuropathies in his hands and legs. He had an unhealed ulcer on his foot prone to infections in countries with inadequate sanitation. He needed periodic examinations to ensure that his foot care was adequate. He had also suffered proliferative retinopathy that had to be treated with laser therapy, requiring ophthalmological examinations every three to four months.[10] He needed examination by an internist every three months to evaluate the diabetes, and probably by a vascular surgeon to check his circulatory problems.

Nevertheless, Mr. Barth's challenge to these conclusions was extensive. Among other criticisms, he contends that no precise standard was applied, that Dr. Zweifel, a family practitioner with no special endocrinology training, was unqualified to render advice, that medical facilities at the sites were, in some instances, far better than the waiver panel recognized, that there should have been a far more complete and effective investigation into his health, that he is entirely capable of managing his own health with the aid of his wife and advice from his doctor by long distance telephone, and that throughout the process the VOA failed to recognize his rights as a handicapped person. He minimizes the risks to his health, the possibility that he might be unable to get insulin, and

the chances of any life threatening emergency, and argues that other healthy Specialists may have emergency injuries.

However, Mr. Barth did not and the record created at trial does not present any persuasive proof that the VOA conclusion was erroneous after all key participants testified subject to cross-examination.

■ There was confusion and disagreement throughout the proceedings before the Court as to whether or not VOA was required to question at the time and prove at trial the competence of the medical judgments on which it relied. The Court accepts that the government's statutory obligation to employment of the handicapped includes an obligation to obtain adequate information regarding medical conditions, corresponding limitations, and available facilities. Accordingly, where a plaintiff has presented medical information to the agency and complains the agency did not competently evaluate it, the Court must examine this charge and consider evidence of the plaintiff's actual condition and available facilities, rather than simply accept the government's understanding of these underlying conditions at the time of its decision. *See School Bd. of Nassau County v. Arline*, 480 U.S. 273, 288, 107 S.Ct. 1123, 1131, 94 L.Ed.2d 307 (1987) (court must conduct individualized inquiry into condition of Rehabilitation Act claimant, with deference to "the reasonable medical judgments of public health officials"). This was accomplished at trial through the testimony of Mr. Barth's doctor and cross-examination of State Department doctors. This evidence tended to confirm both the adequacy of VOA's efforts at the time and the accuracy of VOA's decision in retrospect.

■ There was no obligation under the circumstances, as Mr. Barth contends, for VOA or State Med officials to meet with his doctors, whose own submissions at the

---

10. Mr. Barth's counsel made much of the fact that the only written statements in the record of Mr. Barth's ophthalmologist's specific view that frequent eye exams were required post-date the October 1988 waiver decision. This is of no consequence, given the general understanding by Dr. Zweifel, after consideration of the ophthalmologist's pre-decision letter, of Mr. Barth's condition.

time of the waiver decision, which the waiver panel carefully considered, tended to confirm the conclusion of State Med that Mr. Barth's health would not allow permanent assignment to the Foreign Service. The letter from Mr. Barth's endocrinologist Dr. Ball to the waiver panel stated in part:

At the present time I have no problem with Mr. Barth's functioning in an overseas environment as long as there is a competent physician available to him should he become ill. I would anticipate that that physician should be available to him the same day of illness, as would be appropriate for any diabetic patient.

I personally have no way to anticipate acute illness, but from past experience with State Department personnel, I believe it is fair to say that as long as there is a competent physician available to the personnel of the particular post, then I would believe that Mr. Barth could be assigned. On the other hand, if he were assigned to an area in which no competent medical care would be available for forty-eight to seventy-two hours, then I would feel that that would be an inappropriate assignment.

DX 3. Dr. Ball testified at trial that by "available" he meant "available by telephone," but this certainly was not apparent from the letter, and the waiver panel members quite reasonably took it to mean "available in person." Under the circumstances, the Rehabilitation Act did not require VOA to determine by follow-up call whether Dr. Ball meant "available by telephone."

At trial, Dr. Ball, a skilled endocrinologist, acknowledged that in fall 1988 Mr. Barth was not a well-controlled diabetic and that about half the sites would be inappropriate given Mr. Barth's condition. He also testified that it was never conveyed to him at the time that Mr. Barth was seeking a permanent appointment to the Foreign Service, rather than a more limited assignment abroad. Moreover, his view that Mr. Barth could manage his diabetes by maintaining telephone contact with him was offered without close knowledge of the stresses related to the specific job or the conditions under which the work would be performed—for example, record evidence indicated poor telephone service at various sites. Dr. Ball has accommodated Mr. Barth brilliantly at home, but the testimony of those with first-hand experience overseas, although they were less skilled in endocrinology, was more reliable.

The concern raised by Mr. Barth's counsel as to the waiver panel's lack of reference to precise standards was justified but not dispositive. The record did not show that VOA, in making the waiver decision, paid careful attention to the specific factors outlined in the Rehabilitation Act regulations. Nor was there a written record of proceedings or statement of reasons other than a rote recitation of the four factors set out in section 684.7–5 of the Foreign Affairs Manual. DX 11, 12. This is troubling in the handicap discrimination context. In cases involving race, sex or age discrimination, the decision under review is a straight employment decision which the reviewing court then scrutinizes for signs of bias. In a handicap case, by contrast, the employment decision itself is essentially the same decision—a legal determination of what constitutes "reasonable accommodation"—that the court is ultimately required to address. At least where the defendant is the federal government itself, a statement of reasons, explained in terms of the requirements of the Rehabilitation Act and regulations thereunder, would greatly assist the process. Such findings could help prevent decisions made on the basis of factual errors or misunderstandings and provide a contemporaneous justification for the decision that could be evaluated.

Although the lack of findings hindered the Court's de novo review, the record now before the Court, which focused sharply on the Rehabilitation Act standards, demonstrates that, in general, the waiver panel did focus on whether a reasonable accommodation could be made to Mr. Barth's handicap and, moreover, that the decision was proper and consistent with the requirements of the Rehabilitation Act. The thin staffing at each post required flexibility of

assignment, put a premium on workers not subject to serious health risks, and offered few options for initial assignment of Mr. Barth. Accepting applicants who could basically only work at a few non-hardship posts would be considered unfair to other Specialists and detrimental to morale and success of the program. The Court independently finds that at the time he sought waiver Mr. Barth could function at only three or four posts and that as a matter of law such an accommodation would place an undue burden on the VOA program.

Nevertheless the procedural deficiencies indicated by the record are troubling. In a typical administrative law context, remand might be considered. Here, however, the Court cannot direct a reconsideration of the prior record. Mr. Barth's condition is subject to change and deterioration. The number and status of the various relay stations has changed. The number of available positions is small. It is inappropriate to stage an artificial rerun of the prior decision without regard for present realities. More importantly, the evidence clearly showed that the correct result in terms of the requirements of the Rehabilitation Act was ultimately reached.

However, while judgment must be granted to defendants and the complaint dismissed, this shall be without prejudice to Mr. Barth's right to apply after this date for permanent or temporary overseas duty or assignment with VOA. Any such application should be processed with specific procedures addressing appropriate Rehabilitation Act standards.