**Joe E. MADDEN, Plaintiff,**

v.

**Henry CISNEROS, Secretary of U.S. Department of Housing and Urban Development, Defendant.**

**No. LR–C–91–039.**

United States District Court, E.D. Arkansas, W.D.

Aug. 27, 1993.

Richard Quiggle, Little Rock, AK, for plaintiff.

Lesa B. Jackson, Asst. U.S. Atty., Little Rock, AK, for defendant.

## *ORDER*

ROY, District Judge.

The plaintiff has brought this three-part action against the Secretary of the Department of Housing and Urban Development ("HUD") in which he alleges discrimination/retaliation based on age, handicap, and race. The claims are brought pursuant to the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621–634 (1988) ("ADEA"), Section 504 of the Rehabilitation Act of 1973, and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e.

After the plaintiff properly exhausted his administrative remedies, this matter was tried before the Court. After considering the testimony given and the other evidence submitted, along with the post trial briefs filed by the parties, the Court now makes these findings of fact and conclusions of law.

## I. FACTS

The plaintiff in this case is Joe E. Madden, a white male who was approximately 53–56 years old at the time the events pertinent to this case transpired. Until his retirement, he had been continuously employed by HUD and its predecessor agency, the Federal Housing Administration, since 1962. He served there in several capacities involving loan origination and administration, real estate management, and real estate sales. After joining the agency, he consistently received good work evaluations (at least until the late 1980's) and promotions into positions of increasing responsibility. By 1984 he had become the Chief of the Loan Management and Property Disposition Branch (LMPD) of the Little Rock office. He eventually received the pay grade of GS–13.

His immediate supervisor at that point was Dickie F. Williams, the Director of the Housing Management Division, one of about six divisions within the Little Rock office. The several division chiefs, in turn, reported to the Little Rock Office Manager, John Suskie, and his Deputy Manager, Roger Zachritz. It was Mr. Madden's deteriorating relationship with Messrs. Williams, Zachritz, and Suskie in the late 1980's which eventually led to this lawsuit.

One of Madden's subordinates once he assumed his duties as Chief of LMPD was Carl Grant, a black man. In 1982, which was prior to the time Madden became his supervisor, Grant wrote directly to the Secretary of HUD[1] complaining about what he believed to be racially discriminatory practices occurring in the Little Rock HUD office. These complaints eventually made their way to Suskie as Office Manager. Grant had also sent correspondence directly to Suskie about the same time.

Almost two years later, in early 1984, Suskie told Madden that he did not think Grant was "behaving properly." He told Madden about Grant's complaints sent to the Secretary. He also told Madden that he considered Grant to be a terrible and "disloyal" employee. He further allowed that if the local HUD office were run more like the military, strong action would be taken against Grant. Testimony to this effect offered by the plaintiff was not contradicted by the defense.

Furthermore, at this time Grant was dating a white woman and apparently had a child with her. This relationship was resented by management officials at the Little Rock office, including Suskie.

Late in 1985, Grant was assigned to review the local office's relationship with Union National Mortgage Company. An official at Union later contacted Suskie and alleged that Grant had suggested he wished to seek employment at the bank and that he also sought some type of favorable loan arrangement. These allegations were forwarded by Suskie to HUD's Inspector General's office, which then looked into the matter.

Unrebutted testimony indicates that the Inspector General found no violation of Grant's code of conduct, that there was no adverse information in Grant's file over the previous fifteen years, and that he had had no previous disciplinary incidents. Nevertheless, Suskie then recommended that Madden, who was by that time Grant's immediate supervisor, fire Grant.

It was at this point that Joe Madden's relationship with John Suskie began to deteriorate. As Grant's immediate (first line) supervisor, Madden would ordinarily be the person to mete out any discipline due Grant. Madden told Suskie that Grant's dealings with the bank officials constituted, at most, an error in judgment and that he would not fire Grant. Suskie then said that Grant should be suspended 30 days without pay. Again, Madden said that that penalty was too harsh and he would not impose that penalty. However, over Madden's objections, Grant

---

1. At that time, the Secretary of HUD was Mr. Samuel Pierce.

was suspended for 30 days without pay in early 1986.

Grant appealed and in January of 1987, received a hearing before the Merit System Protection Board. Two supervisor-level HUD employees testified on his behalf: Joe Madden and Katie Worsham. Each would soon suffer for having done so.

Ms. Worsham, a black woman, was the director of the Community Planning and Development Division of the Little Rock office at the time she testified on behalf of Grant. Shortly thereafter she was transferred to Oklahoma City against her will. Suskie testified that he "had absolutely nothing to do with her transfer ...," that it was part of a three person, three city "rotation" that came at the order of Sam R. Moseley, HUD regional administrator, and that he was not aware of her transfer ahead of time.

However, there is credible testimony from Donna Thomas, Suskie's secretary at that time, as well as others, that immediately prior to the announcement of Worsham's involuntary transfer, Suskie was on the phone an inordinate amount of time with Moseley. Thomas shares Worsham's belief that Worsham's transfer was in response to her testimony for Grant at his hearing. Furthermore, several witnesses testified that it would be extremely unlikely for such a high level manager like Worsham, a division director,[2] to be transferred out of an office without the prior consultation, and probably the approval, of that office's local manager. After judging the credibility of the several witnesses, the Court concurs.

Poor treatment of Madden can also be traced to his testimony for Grant. Prior to that time, for example, Madden had made several public speaking appearances out of town on behalf of HUD. Afterward, he was no longer permitted to make such appearances.

Within four months of Madden's testimony for Grant, a training seminar in Washington, D.C. was announced. The topic was managing troubled multi-family housing projects, an area within Madden's responsibility as

Chief of the Loan Management and Property Disposition Branch. Though authorized by the terms of the announcement to attend, Madden was not allowed to go. However, two persons not fully qualified by the terms of the announcement (they did not have the requisite three years experience) were allowed to attend.

After Madden's testimony for Grant, Madden never received another full merit increase, though they had been awarded him almost routinely prior to that in his career.

In August of 1988, Loan Management and Property Disposition Branch was split into two separate branches: Loan Management Branch ("LMB") and Property Disposition Branch ("PDB"). Madden was left in charge of LMB, then supervising about ten employees instead of the 25–30 he had previously supervised. The new PDB was temporarily headed by Ken Brown. The explanation offered was that the work of LMPD had grown too large for one man to oversee.

In October of 1988 a permanent chief for PDB was hired (Ann McIntyre). She began her duties about January of 1989. Also in January of 1989, Madden was "temporarily" relieved of his duties as chief of LMB and assigned to a "special detail."[3] At that time, Brown was transferred to LMB to temporarily take over Madden's position.

Between the time of Madden's testimony for Grant and his eventual assignment to the special detail, a number of criticisms of Madden by Zachritz, Williams, and Suskie, based on dubious grounds, were memorialized in memoranda.

For example, in August of 1988, HUD announced a national plan to sell a number of mortgages in its inventory. Madden immediately assigned two employees the task of determining which of the mortgages in the Little Rock office were eligible under that plan to be sold, which was soon accomplished. Later that fall, the local office received by fax a final list of which of its mortgages were to be part of that program, along with instructions to ship the related

---

2. As Chief of the Community Planning and Development Division, Worsham was a GS–14.

3. The significance of being placed on a "special detail" will be discussed later.

files within 48 hours. On the day the fax was received, those two employees were out of the office so Madden waited until the due date to box up the files in question so he could utilize their help. After the files were boxed up and sent to the mailroom without difficulty, Zachritz went down to the mailroom and started fishing around the files, which led to a memo to Madden about the "problem" of getting the files shipped. Apparently, he thought the files should have been shipped the previous day. In fact, there had been no problem except in Zachritz's mind.

Williams criticized Madden for not disciplining a new employee in the office who has Down's syndrome. The offending conduct of the young man was putting up a small Christmas tree in the office and buying inexpensive presents for office personnel, including some of his superiors, the latter a technical violation of HUD rules. In Madden's judgment, the well-meaning employee had committed a minor and honest mistake. And in fact, when Madden first discussed the matter with Williams, Williams essentially told Madden it was not anything to worry about and that he would take care of it. However, Williams later formally criticized Madden for not taking immediate action against the man.

Madden was also criticized by Williams for not properly seeing that a floppy disc containing tax information was transferred to magnetic tape as a courtesy to the local tax collector. Testimony at trial revealing the accusation to be totally baseless was unrebutted by defendant.

\* \* \*

*Assignment to Detail*

In January 1989 Madden was informed, without prior warning, that he was being "detailed" for a special project. Such details typically involve temporarily moving an HUD employee from his regular work slot to another position for some special purpose, such as to address a manpower shortage or a training assignment.

An office manager has virtually unlimited authority to assign employees to details for up to 120 days. Furthermore, it is permissible to assign a high pay-level employee to do a job classified as a lower pay grade job and it is also permissible to assign a low grade employee to a higher grade position. While a person is involved in a special detail, one is sometimes reflected administratively as being in the new grade position, though one's actual salary and permanent pay grade remain unchanged. After he was assigned to the detail, Madden was redesignated a GS–11 for administrative purposes, even though he continued to received his Grade 13 pay.

The purpose of Madden's special detail was to conduct a study of troubled multi-family housing projects, an area all parties agree is within Madden's area of expertise.[4] Madden does not argue that an assignment to such a detail would in and of itself constitute retaliatory conduct. Rather, he asserts that in this particular case, his assignment to the detail was a form of retaliation, as evidenced by the manner in which the assignment was effected, as well as by the manner he was treated during the detail.

The Court finds that, though the memo from Williams informing Madden of the special detail was dated Thursday, January 19, 1989, it was not given to him until late Friday afternoon, at which time Madden was told to immediately clean out his desk and move to a different office as specified by Williams.

In fact, in the first year of his detail, Madden would be moved four times, each time to a progressively worse work station, some even without telephones. The final move was to a receptionist's desk in an area with high traffic volume and many distractions.

The defense has characterized each move, including the original one, as absolutely necessary because other employees in each particular location soon needed the desk that Madden had come to occupy. However, James Slater, an EEO specialist who worked in one of the areas where Madden was

---

4. Ironically perhaps, this is the same subject presented at the training seminar in Washington which Madden was not allowed to attend.

moved, testified credibly that when Madden was moved from that particular area, there was at all times an available desk there. Slater, who in his capacity as EEO specialist investigated some of the EEO charges Madden eventually brought, also testified that Madden's eventual assignment to the receptionist's desk was not only especially demeaning, it placed Madden in a location where it was extremely difficult to accomplish difficult tasks.

Furthermore, the entire notion that Madden had to be moved in the first place in order to accomplish the special detail is highly suspect. It was essential that Madden have access to files in LMB in order to properly study the troubled projects which were the subject of the special detail. However, all of his desk assignments after he was removed from his branch director's office were relatively far from LMB.

The scope of the detail was substantial. It would involve more than 300 housing projects totaling more than 15,000 living units. Furthermore, Madden was not given detailed instructions until months later about exactly what type of information was to be compiled in his evaluations, yet the reports he submitted were routinely criticized as being incomplete or unresponsive, on those occasions when management responded to his reports at all.

Furthermore, Madden's detail was not as temporary as his superiors suggested at the time. On May 24, 1989, his "temporary" detail was extended an additional 120 days. In September it was again extended an additional 120 days. In fact, until he left HUD he remained on the detail with no end in sight.

Though Madden's superiors consistently represented to him at the time that the detail was temporary, Williams admitted at trial that essentially the assignment was forever. The plan was, once all of the troubled projects were sufficiently identified and analyzed, those properties would be transferred from the loan management specialist who would normally monitor them to Joe Madden until the problems were cured. Given the massive scope of the project, Madden's assignment to the special detail was essentially a permanent relief from his duties as Chief of the LMB.

After being assigned to the detail, Madden never again attended the regular Monday morning staff meetings required for managers because he believed he had been essentially demoted. Office manager Suskie frequently stressed that these meetings were absolutely mandatory absent an exceptional excuse. He would not have tolerated Madden's absence unless he no longer considered Madden to be a meaningful member of management at the Little Rock HUD office.

While working on the detail, Madden's supervisors engaged in various petty behavior directed at Madden. For example, once when Suskie learned that Madden had held a Saturday meeting at the office, he ordered that Madden be disciplined, despite the fact that it was well known that Madden frequently worked nights and weekends and had possessed a key to the office since 1962.

On another occasion, Madden was informed that his designation as Authorized Certifying Officer, which authorized him to approve certain office expenditures, would not be renewed. This is further indication that Madden was essentially being permanently demoted.

As the relationship between Madden and his trio of supervisors continued to deteriorate, he wrote a harsh memo to Suskie on February 2, 1990, in which he severely criticized Williams and Zachritz. This led to a letter of admonishment being directed to Madden on February 13, 1990, the first such disciplinary action taken against Madden in his entire federal government career.

After Madden's formal grievance regarding same was denied on March 13, 1990, he wrote back to Suskie the following day and told him he thought his supervisors' complaints about his work were pretextual and that Suskie was simply trying to contrive a means of getting rid of him. This immediately resulted in Madden's fourth and final desk transfer (to the receptionist's desk) on March 15, 1990.

Madden had been regularly treated for hypertension since 1980. In 1983 he suffered

a substantial heart attack. It is the opinion of Madden's doctor that his heart and blood pressure problems were aggravated a great deal by the stresses of his job after 1987, the time that the harassment of Madden began. In a letter dated March 22, 1990, Dr. David E. Smith recommended that Madden be allowed a thirty day sick leave, a request which was granted. This resulted in some improvement in Madden's symptoms, which encouraged Madden to return to work.

Once back at the office, Madden asked about the likelihood of receiving his old job back as director of LMB. Williams told Madden that he could not because he had not completed his "temporary" special detail.

After one week back on the job, Madden went on extended sick leave because of the aggravation of his heart and blood pressure conditions due to job related stress. He never returned, officially retiring on May 3, 1991.

At the time of Madden's retirement, his annual salary as a Grade 13 was $53,954. His Civil Service annuity worked out to be $28,188, a difference of $25,766 per year. Had he continued with HUD until retirement, he would have worked an additional 11 years.

\* \* \*

■ The Court finds that Joe Madden had a reasonable belief that a black co-worker, Carl Grant, was excessively disciplined simply because he was black. His opposition to that action included refusing to fire Grant and testifying on Grant's behalf at a hearing of the Merit System Protection Board. Because of his actions, Madden was harassed by his superiors in several ways, as more fully described above. Later Madden filed complaints with the EEO on his own behalf which resulted in additional harassment. Eventually, the conditions in the work place became such that Madden had to retire prematurely. The Court finds that Mr. Madden was constructively discharged.

## II. LAW

As stated at the outset, plaintiff alleges three theories for relief: racially based retaliation related to his testimony and other

support for a black co-worker, handicap discrimination relating to his heart and blood pressure conditions, and a violation of the ADEA due to his age. The allocations of burden of production are quite similar as illustrated below:

■ The Supreme Court set out the burden of production in Title VII cases in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–06, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973). "This framework also applies to claims of retaliatory dismissal." *Barnes v. Small*, 840 F.2d 972, 976 (D.C.Cir. 1988). "In order to establish a *prima facie* case of retaliation, a plaintiff must show: (1) that [he] engaged in a statutorily protected activity; (2) that the employer took an adverse personnel action; and (3) that a causal connection existed between the two." *Ibid.* The prima facie case requires only that plaintiff establish facts "adequate to permit an inference of retaliatory motive." *McKenna v. Weinberger*, 729 F.2d 783, 790 (D.C.Cir. 1984). Once the prima facie case is established, the burden shifts to the employer to show a legitimate non-retaliatory reason for the adverse action. If the employer does so, plaintiff has the "opportunity to demonstrate that the proffered reason was not the true reason for the employment decision." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981).

■ To establish a prima facie case of discrimination under the Rehabilitation Act, plaintiff must show that he is a person with a disability, as defined by the Act, that he was disadvantaged because of the handicap, and that he was "otherwise qualified" for the position at issue. If plaintiff establishes a prima facie case that his handicap produced his inability to work, and the agency asserts that it provided all reasonable accommodation, the burden is on the defendant to prove that the accommodation it provided was reasonable, or that such accommodation was either not possible, or would have unduly burdensome. *Carter v. Bennett*, 840 F.2d 63 (D.C.Cir.1988). Proof of discriminatory motive is not required.

The ADEA:

**1258**

forbids employment discrimination against workers aged forty and older. It provides, *inter alia*, that it is unlawful for an employer to discharge any protected individual 'because of an individual's age.' 29 U.S.C. § 623(a)(1). The allocation of the burden of proof in ADEA cases is the same as in cases arising under Title VII....

*Dean Radabaugh v. Zip Feed Mills, et al.,* 997 F.2d 444, 448 (8th Cir.1993).

\* \* \*

■ The Court will first address the plaintiff's age claim. Even if one assumes that the plaintiff made a *prima facie* case for age discrimination and that he also successfully showed that the reasons offered by the defendant were pretextual, plaintiff's work is only half done; he still must prove his case, i.e. he must still prove that *his age* was the determining factor in defendant's actions. *St. Mary's Honor Center, et al. v. Hicks,* —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993.)[5] Plaintiff has not done that. He has not demonstrated to the Court that the actions of the defendant, however otherwise objectionable they might be, were taken because of Mr. Madden's age. In fact, other than the mere allegations to that effect, there was virtually no such evidence at all.

■ The Court also holds that plaintiff's handicap claim must fail. As stated above, part of establishing a *prima facie* case under the Rehabilitation Act is showing that one was disadvantaged because of one's disability. In his exchange of memoranda with his supervisors, Madden mentioned on more than one occasion his heart and blood pressure condition but he repeatedly and vehemently denied that it interfered with his job performance and never asked for accommodation from his employer. In fact, on one occasion he refused to provide medical information relating to his condition and accused

Williams of "invading the privacy of my patient-physician relationship." The Court holds that no violation of the Rehabilitation Act has occurred.

■ The plaintiff's retaliation claim, however, is a different story. The Court finds that the plaintiff easily established his *prima facie* case. Title VII prohibits retaliation against any employee because "he has opposed any practice made ... unlawful [under Title VII] or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title ..." 42 U.S.C. § 2000e–3(a).

Madden's opposition to the punishment given Grant was based on his reasonable belief that Grant was being punished extra severely simply because he was black, an action which would clearly be a "practice made ... unlawful" by Title VII.[6] Thus, Madden was engaged in a statutorily protected activity. Furthermore, the Court also finds that a causal connection existed between Madden's actions and the adverse personnel actions taken by his employers against him, as set out more fully above. This is enough to establish a *prima facie* case.

The Court further finds that the defendant has sustained its burden of production by responding with some evidence of legitimate, non-retaliatory reasons for its actions. However, the Court also finds that the reasons defendant has offered were not the real reasons for its actions, but merely pretextual.

As more fully set out in Part I of this order, the real reason Madden was denied merit pay increases, assigned to a massive "temporary" work detail with no guidance as to what was expected of him, yet criticized for not doing a good job of it, essentially permanently demoted from his job as a branch chief, transferred from desk to desk

---

**5.** Prior to the Supreme Court's decision in *St. Mary's,* it was the law in this circuit that once a plaintiff in a Title VII case proved all of the defendant's proffered reasons for an adverse employment action to be pretextual, the plaintiff was entitled to judgment as a matter of law.

*St. Mary's* was a Title VII race case, not a ADEA claim. This Court's legal conclusion is

predicated on the belief that the reasoning of *St. Mary's* is applicable to ADEA cases as well, since the methodology of proving a ADEA claim has been held to be the same as in Title VII cases.

**6.** Whether the employer's practice was *actually* unlawful is of no consequence. *Wu v. Thomas,* 863 F.2d 1543, 1549 (11th Cir.1989).

without real justification, each one a less desirable place to work than the one before, criticized in memos for things not really true, stripped of certain manager responsibilities, denied opportunities to attend professional training seminars when unqualified office members were allowed to attend, etc., was because he stood up for a black man whom he reasonably believed was being excessively disciplined because of his race. That conduct, especially from one supposed to be a model employer, is unacceptable and constitutes illegal retaliation under Title VII. Plaintiff prevails on this count.

### III. DAMAGES

 The Court orders that the plaintiff shall be immediately reinstated to his former position with HUD, or one reasonably comparable, and shall have the pay designation of GS–13, along with whatever "step" increases which would have accrued in the time since Madden left HUD's employment.

Madden is also awarded backpay equal to the difference between what he received in retirement pay since his official resignation date at HUD and what he would have been paid had he kept working there.

The defendant is also ordered to restore Madden's pension status to what it would have been had Madden kept working. Madden is also to receive full credit for the years of service he would have accrued, for retirement purposes, had he never left HUD's employ. HUD shall also restore to Madden 2103 hours in sick leave. Of course, HUD is permanently enjoined from further acts of retaliation against Madden.

Madden is also entitled to an award of fees and costs.

Counsel for the parties will confer and present a stipulation to the Court regarding the specific amounts of the damages described above no later than September 22, 1993.

IT IS SO ORDERED.