Patricia A. **LANGON**, Appellant,

v.

**DEPARTMENT OF HEALTH AND HUMAN SERVICES, Appellee.**

Nos. 90–5300, 90–5303.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 14, 1992.

Decided March 31, 1992.

---

Tracy Sivitz, with whom Amy E. Wind and Joseph M. Sellers, Washington, D.C., were on the brief, for appellant.

Richard N. Reback, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John D. Bates and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee. Michael J. Ryan, Asst. U.S. Atty., Washington, D.C., also entered an appearance, for appellee.

Before: BUCKLEY, HENDERSON and RANDOLPH, Circuit Judges.

Opinion for the court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

This distressing case comes to us on appeal from the district court's order granting summary judgment for the Department of Health and Human Services (HHS) against its former employee, Patricia A. Langon, on her claims that HHS violated the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 790–794d, by failing to accommodate her handicap, by refusing to promote her and by firing her. Our review discloses genuine disputes over material facts such that summary judgment should not have been entered on the accommodation claim. We therefore reverse in part and remand.

I

Ms. Langon has for many years suffered from multiple sclerosis, a degenerative neurological disorder. Under the auspices of its affirmative action program for handicapped individuals, HHS's predecessor hired Ms. Langon as a computer programmer in December 1979. By all accounts, her performance during the first twenty-one months proved satisfactory. When she then began experiencing increased fatigue and weakness, common symptoms of multiple sclerosis, she tried several means to cope: coming in and staying late when she was tired in the morning, moving near her sister so that her sister could drive her to work, and taking leave without pay in order to recuperate. Her erratic work schedule and her extensive absences without permission caused disruption at HHS, but the agency tolerated the situation out of consideration, the record fairly reflects, for her condition.

By May 1981, Ms. Langon had decided to seek HHS's direct assistance. It was at this point she asked for better ventilation, a new telephone chime, and less machine noise, and then, six weeks later, followed these proposals with a more demanding request—permission to work at home. Her frequent attacks of weakness and fatigue, she said, prevented her from commuting to work and the commuting itself contributed to her weakened condition. She supported her request with a letter from Dr. Harri-

son, her treating physician. He attested to her symptoms; stated that these symptoms impair her physical energy, but not her mental faculties; and suggested that an "option for this patient that must be considered is for her to work a significant amount of time at home."

HHS made most of the adjustments Ms. Langon suggested. She received better ventilation and a quieter work station. The agency also offered her a change in working hours to make her commuting easier, part-time work (which she accepted) and rest periods during the workday. As to her other request, her supervisor informed her—incorrectly it turned out—"that unfortunately this Department does not have any policy or provisions for employees to work at their home[s]."

Ms. Langon then sent a memorandum to the Director of Personnel in the Office of the Secretary, describing in considerable detail her current state, how the tasks of "dressing, walking, driving, etc. to get to work" had exacerbated her health problems, why she needed to work full time in order to pay her rent and survive, how working at home would enable her to overcome her handicap and perform satisfactorily, and why her job was of the sort that could be performed at her residence. In an internal memorandum on August 10, 1981, the Personnel Director advised one of Ms. Langon's superiors that a "number of Federal agencies, including our own, have in the past and are currently allowing certain severely disabled employees to work at home," that under applicable regulations agencies must make a "reasonable accommodation to the known" handicaps of employees, and that in some agencies working at home "has been interpreted as a reasonable accommodation." (The memorandum mentioned a "draft HHS Instruction concerning Work at Home"; this apparently referred to the draft of what became HHS Instruction 300–2, issued October 14, 1981, authorizing "[s]everely handicapped persons for whom it would be difficult to commute to the work site" to work at home.) The Personnel Director concluded that in Ms. Langon's case he did not have sufficient information to determine wheth-

er her symptoms were severe enough to preclude commuting. His assistant had tried to contact Dr. Harrison, but he was "out of the country until August 10." The Personnel Director reported that he had informed Ms. Langon of the need for "additional information ... before a final decision can be made but that she should continue her request." So far as the record shows, Ms. Langon was not specifically instructed about what type of "additional information" she should supply.

In an apparent response to the request for more information, Dr. Harrison composed another letter on behalf of Ms. Langon in November 1981, this one far more emphatic and alarming than the first. Her disease, he wrote, was "of a very serious nature and could cause the total mental and physical incapacitation of Miss Langon if she is not henceforth handled with care." While he thought her computer programmer job "was excellent for her," in his opinion "the patient must be allowed to do this job full time in her home most of the week, or the daily commuting to the job will rapidly and severely threaten her health." Dr. Harrison added that if there were any questions, the recipient of the letter should not hesitate to call him.

Ms. Langon submitted this letter in support of her continuing request to work at home, but there is nothing in the record to indicate whether HHS took Dr. Harrison up on his offer to answer any inquiries. What next appears is a February 3, 1982, memorandum to Ms. Langon from the head of her division formally rejecting her plea to work at home, this time on the ground—not that more information was needed—but that her job as a computer programmer "does not lend itself to work at home" because it "requires a great deal of exactness," and because her assignments "usually have specified short deadlines," and "most often require face-to-face contact with report requestors."

A few weeks earlier, HHS had formally denied Ms. Langon's longstanding request for a grade increase, a request she first made shortly after joining the agency in 1979. Though most of her computer pro-

gramming colleagues were GS–12s, HHS hired Ms. Langon as a GS–11. At the time, her superiors did not think her experience sufficiently demonstrated that she could perform at a GS–12 level. In denying her request for promotion in January 1982, HHS explained that she had yet to perform up to the standards of a GS–12.

After January 1982, Ms. Langon failed to complete any of the reports assigned to her. In March she filed a complaint with HHS claiming that the agency had discriminated against her on account of her handicap by refusing to allow her to work at home and by failing to promote her. According to Ms. Langon, the stress of challenging the department's actions, meeting with investigators, union representatives and supervisors, took its toll on her health and on her ability to work. According to her superiors at HHS, she refused to complete any assignments until she was promoted. In June 1982, while her complaint was pending, HHS notified Ms. Langon that her performance was unacceptable, and in September it proposed her removal. During the summer, HHS had asked her to provide medical records and take a fitness-for-duty examination. Ms. Langon refused. In her deposition in this case, she explained that HHS was requesting records not from Dr. Harrison, but from a doctor she had not seen in several years, and that she feared the medical records collected would be used to ridicule or terminate her. She later reconsidered, and informed her HHS counselor that she would take the fitness-for-duty examination. We cannot determine whether her change of mind came to the attention of her superiors. We do know that in January 1983, HHS terminated her. In its notice of termination, HHS indicated that her performance had been unsatisfactory. Because Ms. Langon had not supplied "current and complete medical evidence," HHS rejected her explanation that her illness had prevented her from performing but that she could have done the work if only the agency had granted her request to work at home.

HHS ultimately denied Ms. Langon's failure-to-accommodate complaint, a decision sustained by the Equal Employment Opportunity Commission upon her appeal. The EEOC found that Ms. Langon had established a *prima facie* case that she needed to work at home in view of her handicap, but concluded that HHS was warranted in refusing to grant this accommodation because it would have imposed an "undue hardship" on the agency. Ms. Langon also challenged her firing in an appeal to the Merit Systems Protection Board. This too was denied because, the Board found, her removal for unacceptable performance was supported by substantial evidence and because the evidence failed to show that her poor performance "was caused by her handicapping condition."

Having exhausted her administrative remedies, Ms. Langon brought suit in the district court, seeking reinstatement, an order granting her a promotion, an injunction requiring HHS to accommodate her handicap, back pay, and costs. On cross-motions for summary judgment, the court entered summary judgment in favor of HHS. *Langon v. U.S. Dep't of Health & Human Services*, 749 F.Supp. 1 (D.D.C.1990). The court rested its decision primarily on the ground that Ms. Langon had failed to provide HHS with "meaningful medical evidence" to justify any adjustments for her condition other than those the agency offered. HHS was not required to allow her to work at home because she had not submitted "medical records" showing "that her condition rendered her unable to commute to work." *Id.* at 6. The district court viewed her submissions to HHS during the relevant period as "cursory descriptions of her multiple sclerosis" and mere "doctors' recommendations that she be allowed to work at home." *Id.*

## II

In considering whether the district court correctly determined, in the words of Rule 56(c) of the Federal Rules of Civil Procedure, "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law," the logical place to begin is with the "law," here the Rehabilitation Act of 1973, and its amendments. *Anderson v.*

*Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). When we look to the statute, however, we find little to assist in the disposition of this case. The parties argue about whether HHS violated section 501(b) of the Act, but so far as pertinent here this provision simply requires each federal agency to formulate an affirmative action plan for the "hiring, placement, and advancement of individuals with handicaps" in the agency; to provide "sufficient assurances, procedures and commitments" to accomplish these objectives; and to include within such a plan "a description of the extent to which and methods whereby the special needs of employees with handicaps are being met." 29 U.S.C. § 791(b). An agency's failure to comply with section 501(b), we held in *Ryan v. Federal Deposit Insurance Corp.,* 565 F.2d 762 (D.C.Cir.1977) (per curiam), could be reviewed under the Administrative Procedure Act.

In the 1978 amendments to the Act, Congress gave individuals another avenue of relief, a private cause of action in federal court. Section 505(a)(1), which Ms. Langon invoked, empowers courts to fashion remedies for violations of section 501 and provides that the courts "may take into account the reasonableness of the cost of any necessary work place accommodation, and the availability of alternatives therefor or other appropriate relief in order to achieve an equitable and appropriate remedy." 29 U.S.C. § 794a(a)(1).

Reading this statutory language, one might suppose that a violation of section 501(b) could occur only if the agency's plan were inadequate, and that the remedy set forth in section 505(a)(1) was meant to authorize federal district courts to impose upon the agency an acceptable plan. *Cf. Shirey v. Devine,* 670 F.2d 1188, 1198–99 (D.C.Cir.1982). But wholly apart from whether an agency's plan satisfied section 501, the courts have recognized private actions challenging individual employment decisions. *See, e.g., Fuller v. Frank,* 916 F.2d 558 (9th Cir.1990); *Arneson v. Heckler,* 879 F.2d 393 (8th Cir.1989); *Rodgers v. Lehman,* 869 F.2d 253 (4th Cir.1989); *Milbert v. Koop,* 830 F.2d 354 (D.C.Cir.1987);

*Mantolete v. Bolger,* 767 F.2d 1416 (9th Cir.1985); *Gardner v. Morris,* 752 F.2d 1271 (8th Cir.1985); *McGuinness v. United States Postal Service,* 744 F.2d 1318 (7th Cir.1984); *Smith v. United States Postal Service,* 742 F.2d 257 (6th Cir.1984); *Treadwell v. Alexander,* 707 F.2d 473 (11th Cir.1983); *Prewitt v. United States Postal Service,* 662 F.2d 292 (5th Cir.1981). The basic claim in several of these cases was, as here, that the agency failed to extend a "reasonable accommodation" to a particular handicapped employee and thereby violated section 501. *See, e.g., Milbert v. Koop,* 830 F.2d at 355. The phrase "reasonable accommodation" does not appear in section 501. It is apparently derived from a regulation issued by the EEOC, 29 C.F.R. § 1613.704(a), which reads:

> An agency shall make reasonable accommodation to the known physical or mental limitations of a qualified handicapped applicant or employee unless the agency can demonstrate that the accommodation would impose an undue hardship on the operation of its program.

In *Carter v. Bennett,* 840 F.2d 63 (D.C.Cir.1988), an employee of the Department of Education contended that the agency violated section 501(b) by failing to accommodate his handicap (blindness). After quoting this EEOC regulation, we affirmed the district court's decision that the agency had made sufficient accommodations for the employee. The "applicable legal standard," we agreed, was that although the agency did not have to provide every accommodation the handicapped employee proposed, the agency "must, at a minimum, provide reasonable accommodation as is necessary to enable him to perform his essential functions." 840 F.2d at 67 (inner quotation marks and emphasis omitted).

Did HHS make "reasonable" accommodations to Ms. Langon's "known handicap" to enable her to perform the "essential functions" of her job? The district court found that the agency had done enough, principally because Ms. Langon had not supported her need to work at home with "meaningful medical evidence." The dis-

trict court also concluded that Ms. Langon had not established that she was a qualified handicapped employee. We hold that the court erred in granting summary judgment against Ms. Langon on her accommodation claim on these grounds.

Before we address the district court's opinion directly, a few words are in order about HHS's shifting positions in this case and the confusion this has generated. It has been ten years since HHS—in its words at the time—"finally" refused to allow Ms. Langon to work at home. When her supervisor reached this decision in February 1982, the only reason given was that the accommodation would impose an undue hardship on the agency. In December 1983, HHS denied Ms. Langon's appeal on this ground but added another—that she was not a "qualified handicapped individual" within the meaning of 29 C.F.R. § 1613.702(f), which defines the phrase as a "handicapped person who, with or without reasonable accommodation, can perform the essential functions of the position in question without endangering the health and safety of the individual...." HHS deemed her unqualified after finding that her dressing, walking and driving to work had endangered her health, despite the agency's efforts to ameliorate her problems. To reach this conclusion, HHS necessarily credited not only Ms. Langon's description of her condition in her letter to the Personnel Director, which it quoted, but also Dr. Harrison's opinion recited in his letter of November 1981. In the district court, and on appeal, however, HHS has put forth an entirely different and, in some ways contradictory, rationale. Now the idea is, first, that Ms. Langon did not supply HHS with sufficient medical evidence "linking [her] handicap condition with her inability to perform," a position entirely at odds with HHS's findings in 1983; and, second, that she thwarted HHS's attempt to gather such information *after HHS already had denied her request.* HHS Brief at 11. One cannot escape the impression that Ms. Langon is being whipsawed. To HHS in 1983, Ms. Langon's evidence demonstrated that her commuting to work endangered her health;

to HHS in court, Ms. Langon's evidence did not "support [her] assertion that the commute to work threatened her health." *Id.* at 20.

Despite these incongruities, the district court agreed with HHS's litigating position that Ms. Langon had failed to furnish sufficient medical information to the agency to entitle her to work at home. We will not pause to consider whether that defense is even open to the agency in view of its failure to invoke it in February 1982 or in its decision on appeal. *Cf. Cuddy v. Carmen,* 762 F.2d 119, 127 (D.C.Cir.1985). It suffices to point out that the matter of medical records went to the factual question whether Ms. Langon had adequately alerted HHS to the severity of her handicap, and thereby triggered the agency's obligation under section 501 and the regulations to accommodate her if it reasonably could do so. As to that question of fact, there was a genuine dispute. What is contained in the record is more than enough to enable a reasonable trier of fact to return a verdict for Ms. Langon who, as the non-moving party, was entitled to have the evidence viewed in the light most favorable to her. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249, 106 S.Ct. at 2510; *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam).

In the first place, when Ms. Langon made her request there was nothing necessarily requiring handicapped employees seeking an accommodation to present medical records. Then, as now, an employee confined to a wheelchair would hardly need a doctor's report to show that she needed help in getting to her workstation if this were accessible only by climbing a steep staircase. A blind employee would not have to furnish medical records to establish that he needed some accommodation to be able to review written reports. The statute does not mention "meaningful medical evidence"; there was nothing in the EEOC's regulations to this effect; the judicial decisions cited above have not insisted on this;

HHS's work-at-home policy did not demand medical records; there is evidence in the record indicating that HHS routinely acted on doctors' recommendations and nothing more; when the director of Ms. Langon's division finally denied her request to work at home in February 1982, he did not explicitly base his decision on the lack of medical information; and when HHS sustained his decision it did not cite any lack of medical evidence as the reason for the denial of her request.

True, under section 501 and the EEOC regulation cited above employees are obligated to make their handicap known to the federal employer. In Ms. Langon's case, everyone was aware that she suffered from multiple sclerosis. But HHS's early experience with her demonstrated that even with this disease she could perform her job and commute to work. It was therefore incumbent upon Ms. Langon to provide evidence to HHS showing that her disease had intensified to the point where commuting was no longer possible. Certainly her own perceptions about this would be significant. She would know the extent of her fatigue and weakness, the effect commuting was having on her, and the toll this was taking on her job performance. Her letter to the HHS Personnel Director in the summer of 1981 set forth the extent and severity of her illness in dramatic detail. Her account was in part corroborated by the amount of leave without pay she took. In addition, the accommodations HHS did make tended to confirm her supervisors' awareness that little things unimpaired persons might not even notice, like telephone chimes and the noise from machines, adversely affected her. Dr. Harrison's November 1981 letter, submitted after HHS requested more "information," was also probative. Dr. Harrison stated in no uncertain terms that Ms. Langon "must be allowed to do this job full time in her home most of the week, or the daily commuting to the job will rapidly and severely threaten her health." In its decision on appeal, HHS agreed with Dr. Harrison's evaluation when it found that commuting to work had "seriously endangered" Ms. Langon's health. Viewing this evidence in the light most favorable to Ms. Langon, we are persuaded that a reasonable trier of fact could determine that Ms. Langon was severely handicapped and was having great difficulty commuting to work and that the agency had knowledge of these facts.

We recognize that during the summer of 1982 Ms. Langon refused to provide further medical evidence to HHS or to undergo a fitness-for-duty examination. The question facing the agency at that time, however, was not whether it should allow her to work at home but whether HHS should fire her for poor performance. Ms. Langon explained that she refused to provide that information out of fear that it would be used against her, that her supervisors "were trying to find a reason to put me out." As to the physical examination, she testified that she revoked her initial refusal a few days later, but the agency never acknowledged her willingness to go ahead. The district court nevertheless inferred from her refusals that she "could not substantiate her claims with medical evidence prior to her termination." *Langon v. HHS*, 749 F.Supp. at 6. If by "claims" the court meant to include her previously-rejected claim that she should be permitted to work at home, we think the court's inference was improper. On summary judgment, the evidence should be viewed in favor of the nonmoving party, not the other way around. *See, e.g., United States v. Diebold*, 369 U.S. at 655, 82 S.Ct. at 994. We have already explained why there was no absolute requirement that employees provide "medical evidence" with respect to an accommodation claim. Furthermore, Dr. Harrison's letter of November 1981 did provide such evidence. From all that appears, he was a reputable physician stating a medical opinion based on personal observation and examination of the patient, in short, the sort of expert "medical evidence" routinely admitted under Rule 704 of the Federal Rules of Evidence. Contrast *Mid–State Fertilizer Co. v. Exchange National Bank*, 877 F.2d 1333, 1339–40 (7th Cir.1989).

At this point it is appropriate to add a caveat. Personnel practices put into effect in 1989—but not cited to us by HHS—currently require employees to make their handicap known to their agency by "submit[ting] to a medical examination requested by the employer or produc[ing] medical documentation to support a reasonable accommodation request if the [employee's] limitation is not immediately apparent." FEDERAL PERSONNEL MANUAL 339–26 (Apr. 28, 1989). Dr. Harrison's letter was probably too thin to meet the definition of "medical documentation." By this the PERSONNEL MANUAL means a "diagnosis or clinical impression ... justified according to established diagnostic criteria...." *Id.* at 339–3. But these instructions came into effect many years after the events of this case, HHS does not invoke them, and we express no views about their effect in a case in which they were applied.

Moreover, as we have said, HHS's refusal to allow Ms. Langon to work at home rested on HHS's assertion that computer programmers in her position had to do their work at the agency. When HHS sought summary judgment on Ms. Langon's accommodation claim, it was required to identify the *material* facts. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). At that time, the agency cited the infeasibility of her particular job being performed outside the agency's offices. That "fact" was undoubtedly material, but it was scarcely undisputed as Rule 56 requires. The district court recognized as much. "[I]t appears," the court stated, "that the accommodation requested by plaintiff would not have 'impose[d] an undue hardship' upon [HHS's] operations." *Langon v. HHS,* 749 F.Supp. at 7 n. 3. The burden of showing undue hardship was on HHS, yet as against Ms. Langon's description of her job and her deposition indicating that the position did not demand her being in the office, HHS failed to offer any contrary affidavit or deposition. In its statement of material facts not in dispute, HHS merely pointed to its February 3, 1982, memorandum informing Ms. Langon that due to the exactness required of computer programmers like

her, the short deadlines, and the frequent face-to-face contacts, her position did not "lend itself to working at home." This memorandum was not a record of a regularly conducted business activity (Fed. R.Evid. 803(6)); we need not decide whether it is nevertheless admissible as "an investigation made pursuant to authority granted by law." Fed.R.Evid. 803(8)(C); *but see Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 168 n. 11, 109 S.Ct. 439, 449 n. 11, 102 L.Ed.2d 445 (1988). Even if it were, HHS's memorandum could be read as indicating only that letting Ms. Langon work at home would create some difficulty for the agency, not that it would impose, in the language of the regulation, an "undue hardship" on HHS. 29 C.F.R. § 1613.-704(a). At all events, Ms. Langon, through her deposition testimony, has disagreed with HHS about the length of the deadlines and the need for frequent face-to-face contacts. A genuine dispute about this material fact thus exists.

In granting summary judgment, the district court also found it undisputed that Ms. Langon was not a "qualified handicapped individual." What the court had in mind is far from certain. At one point, the court paraphrased the EEOC's definition (29 C.F.R. § 1613.702(f)), concluding that she was unqualified because she failed to show that "she could perform the essential functions of her position without endangering her health, even with reasonable accommodation as provided by defendant." *Langon v. HHS,* 749 F.Supp. at 6. If by "reasonable accommodation" the court meant work at home, this suggests that if Ms. Langon continued in her position her health would be jeopardized no matter where she worked. We doubt this was the meaning the court intended. The court had already found that Ms. Langon had not come forward with enough medical evidence to demonstrate that her condition had worsened. On the other hand, if by "reasonable accommodation" the court intended to refer to the other adjustments HHS had provided to her (better ventilation, quieter surroundings, part-time work, rest periods), the court's statement indicates that her com-

muting was "endangering her health." But that, it seems to us, makes Ms. Langon's point. At all events, the essential question regarding Ms. Langon's status as a "qualified handicapped employee" was whether, with the accommodation she sought, she could have performed the essential functions of her position. (If she could, the burden is on the agency to show why the accommodation was not a reasonable one. *See, e.g., Carter v. Bennett,* 840 F.2d at 65–66.) On that score, there was a factual dispute precluding summary judgment. Ms. Langon was convinced that she could satisfactorily function as a computer programmer at home and she provided evidence to this effect based on her perceptions of her own condition and ability. Dr. Harrison shared her conviction. He informed HHS that Ms. Langon's position as a computer programmer was "excellent for her because of its sedentary and mentally stimulating nature." Further, the EEOC found that her "handicap could be accommodated if the agency permitted her to work full-time at home." Although the district court was to conduct a trial *de novo,* this finding was evidence to be taken into account. *Chandler v. Roudebush,* 425 U.S. 840, 863 n. 39, 96 S.Ct. 1949, 1961 n. 39, 48 L.Ed.2d 416 (1976); *but see McKenna v. Weinberger,* 729 F.2d 783, 792 (D.C.Cir.1984). In short, there was a genuine issue about whether, with the accommodation she sought, Ms. Langon could perform the essential functions of her position.

In sum, because there are genuine factual disputes about whether Ms. Langon provided HHS with sufficient information concerning the severity of her illness to invoke the department's work-at-home policy, about whether she could have performed her job with that accommodation, and about whether letting her work at home would have imposed an undue hardship upon HHS, summary judgment should not have been granted.

■ Thus far, we have spoken only of Ms. Langon's accommodation claim. Her two other claims—that HHS refused to promote her and then terminated her because of her handicap, or, as her Amended Complaint put it, that these agency decisions were "motivated by discrimination on the basis of handicap"—appear to be based upon a theory of disparate treatment. If so, the district court properly entered summary judgment on them. Ms. Langon did not present any direct evidence of bias on the part of HHS, and no reasonable jury could infer that HHS refused to promote Ms. Langon because of her handicap. The record shows that HHS refused to promote her because her performance had not risen to the level of a GS–12 and terminated her because she failed to complete any assignments after January 1982. *Langon v. HHS,* 749 F.Supp. at 7–8.

Perhaps realizing these deficiencies, on appeal Ms. Langon disavows any disparate treatment theory. She "claims that she was fired because of unacceptable performance engendered by the government's failure to accommodate her, and not because they harbored ill will towards her because of her handicap." Langon Brief at 20. Her failure-to-promote claim, she says, is based upon similar reasoning. Under this theory, the agency's adverse actions were not in and of themselves violations of section 501(b); they were the direct and foreseeable consequences of a violation— HHS's refusal to allow her to work at home. The evidence in the record indicates that HHS rejected Ms. Langon's request once, in February 1982. Earlier rejections were preliminary and conditional. As a consequence, under the theory Ms. Langon advances on appeal, she contends that HHS violated section 501(b) only once, when it failed reasonably to accommodate her. Her allegations concerning HHS's denial of her promotion request and its termination of her are like allegations of special damages: while they may affect the nature of the relief received, they do not establish that HHS committed separate violations of section 501(b).

On remand, Ms. Langon will be free to establish a causal connection between HHS's alleged failure to accommodate her and the deterioration in her performance leading to the denial of her promotion request and the termination of her employment. If she is successful and if the dis-

trict court finds that HHS failed to satisfy its duty to accommodate Ms. Langon's handicap, the court should take this into account in formulating a remedy for the harm caused by that failure. Ms. Langon will not, however, be able to establish, based solely upon either the denial of her promotion or the termination of her employment, that HHS's adverse employment actions separately violated the Rehabilitation Act. We therefore affirm the district court's entry of summary judgment on Ms. Langon's termination and failure-to-promote claims.

Accordingly, the judgment of the district court is reversed in part and affirmed in part, and the case is remanded for further proceedings in connection with Ms. Langon's failure-to-accommodate claim.