Alberta P. GASKINS, Plaintiff

v.

Marvin T. RUNYON, Postmaster
General, Defendant.

Civil Action No. 91–2098 (HHG).

United States District Court,
District of Columbia.

March 30, 1994.

Lawrence C. Lanpher, Helen M. Barch–Kuchta, Kirkpatrick & Lockhart, Washington, D.C., for Plaintiff.

Douglas A. Wickham, Assistant U.S. Attorney, Washington, D.C., for Defendant.

## OPINION

HAROLD H. GREENE, District Judge.

This case came before the Court for a bench trial. With the benefit of the full record now before the Court, including Proposed Findings of Facts and Conclusions of Law presented by both plaintiff and defendant, this case is ripe for a decision on the merits.

### I

Plaintiff began her employment with the United States Postal Service in 1963 as a "Distribution Clerk" and was later promoted to the position of "Special Distribution Clerk" or "Review Clerk." These positions essentially involved the sorting of mail while standing in front of a metal "case" that contained various slots for receiving mail. However, the duties of these positions also involved considerable physical activity, including lifting, pushing, and pulling large quantities of mail.

In 1979, plaintiff allegedly injured her back while on the job.[1] As a result, plaintiff was absent from work a significant amount of time from 1979 through 1983. During 1983 she was terminated by the Postal Service. Subsequently, however, an arbitrator ordered defendant, pursuant to her rights under the then existing collective bargaining agreement in effect between her union and the Postal Service, to re-employ plaintiff in a position which could be performed in a chair with a back support. As a result, plaintiff

---

1. The record further demonstrates that plaintiff allegedly further injured or re-injured her back in a 1984 automobile accident. Both of these injuries occurred prior to the time period that is the basis of this action.

returned to work in January 1985 and was assigned a position as a Review Clerk in the Rehabilitation Unit, a unit that had been established and designated especially for postal employees with back problems; employees who required reduced work loads, and positions that could be accomplished through the use of chairs with back supports.

While working in the Rehabilitation Unit during 1985 and 1986, plaintiff was not required to engage in heavy lifting or other strenuous activities normally required of a Review Clerk. In addition, employees in the Rehabilitation Unit worked in front of shorter "cases" than those ordinarily used by Review Clerks. This allowed the clerks to perform their sorting functions while seated.

Sometime prior to plaintiff's return to work in 1985, a number of "blue" chairs were purchased specifically for use in the Rehabilitation Unit. These chairs were purchased for that unit based upon their alleged "orthopedic" characteristics. After these chairs were purchased, it became defendant's policy to require all employees in the unit to use the chairs. However, several employees, plaintiff among them, apparently disliked the "blue" chairs and requested the use of other chairs available in the facility. Specifically, plaintiff repeatedly requested the use of an "orange" chair apparently available in the cafeteria. This request was denied.

Plaintiff alleged that the "blue" chair she was required to use worsened her back condition and caused her great pain. She further alleged that as a consequence, she was forced to miss substantial periods of work in 1985 and 1986, and eventually to leave the Postal Service in May 1986, never to return. Plaintiff retired based upon disability in 1989.

Plaintiff brought this action pursuant to 29 U.S.C. §§ 791 and 794 (sections 501 and 504 of the Rehabilitation Act) alleging that defendant's refusal to accommodate her request to use the "orange" chair, or any chair other than the mandated "blue" chair, represented discrimination on the basis of her handicap. She further alleged that defendant's actions in this regard caused her "constructive discharge" and forced her into a disability retirement in 1989.[2] The complaint sought, *inter alia,* back-pay for work allegedly missed due to defendant's wrongful behavior, reinstatement to her former or a comparable position, and attorney's fees.

## II

To establish a prima facie claim under the Rehabilitation Act, an employee must first establish (1) that she is a "handicapped person," (2) that she is "otherwise qualified," and (3) that defendant's practices which prejudiced her were motivated "solely by reason of her handicap or caused by a handicap-related disparity."[3] *See Matzo v. Postmaster General,* 685 F.Supp. 260, 262 (D.D.C. 1987), *aff'd,* 861 F.2d 1290 (D.C.Cir.1988); *Guerriero v. Schultz,* 557 F.Supp. 511, 513 (D.D.C.1983).

## A

The initial inquiry, then, is whether plaintiff was a "handicapped person" during 1985 and 1986, the period in question, for purposes of the Rehabilitation Act. A handicapped person is "any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment." 29 U.S.C.

2. Plaintiff originally filed two separate complaints. However, these were combined in one amended complaint after counsel was appointed. The amended complaint also stated claims for violations of Title VII of the Civil Rights Act of 1984, 42 U.S.C. § 2000e–16, and the Due Process Clause of the Fifth Amendment of the U.S. Constitution. These claims, however, were withdrawn by plaintiff prior to trial.

3. Section 504 of the Rehabilitation Act provides in pertinent part:

No otherwise qualified handicapped individual in the United States, as defined in section 706(7) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794.

§ 706(7)(B).[4] "Physical or Mental impairment" is defined, in pertinent part, as:

> any physiological disorder or condition, cosmetic disfiguration, or anatomical loss affecting one or more of the following body systems: Neurological; musculoskeletal; special sense organs; cardiovascular; reproductive; digestive; genito-urinary; hemic and lymphatic; skin; and endocrine....

29 C.F.R. § 1613.702(b)(1). "Major life activities" is defined as "functions, such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1613.702(c).

The Court concludes that, at all times relevant, plaintiff was a "handicapped person." Although the testimony of defense witness Dr. Robert Gordon, an orthopedic specialist, raises substantial doubts as to whether plaintiff *actually* suffered from back ailments, and in particular whether plaintiff suffered from a herniated disc, that testimony is, at bottom, irrelevant for purposes of the instant inquiry.[5]

The record amply demonstrates that defendant had long regarded plaintiff as suffering from an impairment that substantially limited her ability to work.[6] In this regard, it is clear that plaintiff (1) had a record of a substantial physical impairment and (2) was regarded as having such an impairment.[7] This is all that is required to bring plaintiff within the protection of the Rehabilitation Act. *See* 29 U.S.C. § 706(7)(B); 29 C.F.R. § 1613.702(a).

## B

    The next inquiry is whether plaintiff was "otherwise qualified" for purposes of the Rehabilitation Act. An individual is otherwise qualified if she can meet all the requirements of the position in spite of the handicap, with or without reasonable accommodation. *Southeastern Community College v. Davis,* 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979).[8] Here again the Court concludes that plaintiff was "otherwise qualified."

Despite defendant's contention that the Court should make this determination based

---

**4.** EEOC regulations provide an essentially identical definition. *See* 29 C.F.R. § 1613.702(a).

**5.** The Court views Dr. Gordon's testimony regarding his conclusion that plaintiff did not suffer from a herniated disc as quite convincing. Dr. Gordon testified with respect to the shortcomings of a 1979 myelogram, on which Dr. Azer's diagnosis of a herniated disc is apparently based. Moreover, he explained that his conclusions were reached largely as a result of the three negative CT scans subsequently performed in 1984, 1986 and 1987, as well as the negative diagnoses of two respected surgeons with whom he was familiar.

**6.** Indeed, plaintiff's placement in the Rehabilitation Unit and the findings of defendant's own medical officers verify this conclusion. Although the extent of the limitations appear to have varied over time, they were nevertheless considered significant and permanent.

The Court's conclusion in this regard is not altered by the fact that defendant had repeatedly maintained, when faced with plaintiff's numerous EEO complaints, that plaintiff was not "handicapped." In this regard, the Court believes that defendant clearly treated plaintiff as if her ability to work was substantially limited.

**7.** In this regard, the EEOC regulations specifically provide:

*Has a record of such an impairment* means has a history of, or has been classified (or misclassified) as having a mental or physical impairment that substantially limits one or more major life activities.

*Is regarded as having such an impairment* means (1) has a physical or mental impairment that does not substantially limit major life activities but is treated by an employer as constituting such a limitation; (2) has a physical or mental impairment that substantially limits major life activities only as a result of the attitude of an employer toward such impairment; (3) or has none of the impairments defined in paragraph (b) of this section but is treated by an employer as having such an impairment.

29 C.F.R. 1613.702(d) & (e)..

**8.** The EEOC regulations provide in relevant part:

*Qualified handicapped person* means with respect to employment, a handicapped person who, with or without reasonable accommodation, can perform the essential functions of the position in question without endangering the health and safety of the individual or others and who, depending upon the type of appointing authority being used:

(1) Meets the experience and/or education requirements (which may include passing a written test) of the position in question, or

(2) Meets the criteria for appointment under one of the special appointing authorities for handicapped persons.

29 C.F.R. § 1613.702(f).

on whether plaintiff was fit to perform the ordinary duties of a Review Clerk—and the Court would certainly find that plaintiff was unable to do so, *see Florence v. Frank,* 774 F.Supp. 1054, 1061 (N.D.Tex.1991) (if handicap would prevent plaintiff from performing job in question without eliminating essential functions of the job, he cannot be found "otherwise qualified")—under the facts presented in the instant case, the Court must disagree with defendant.

As previously noted, plaintiff was re-hired in 1985 as a result of an arbitration award. That award specifically dealt with the fact that plaintiff had sought permanent re-assignment, under the terms of her collective bargaining unit's agreement with the Postal Service, to a "light duty" position which could be performed in a chair with a back support. It is also clear that upon plaintiff's return in 1985, her assignment to the Rehabilitation Unit was designed to meet precisely the requirement of a permanent light-duty position. Thus, the Court finds that the determination as to whether plaintiff was "otherwise qualified" must be made based on her ability to perform the duties assigned in the Rehabilitation Unit upon her return in 1985.

In this regard, the Court concludes that plaintiff was otherwise qualified for this position. The record demonstrates that she possessed the skill, training, and experience necessary to accomplish all the tasks required in that limited position. Defendant's contention that plaintiff was incapable of holding *any* full-time job due to her back pain is reject-

ed—at least as it relates to the period in 1985 and 1986.[9] While it may be true that plaintiff's condition might have required periods away from work, there is no evidence to indicate that this leave could not have been accommodated based upon plaintiff's regular earned leave accruals or defendant's policies in connection with such leave.

### C

Finally, it is clear that the issues raised in this case result from plaintiff's handicap. It cannot be disputed that plaintiff's back problems are at the heart of her complaints and defendant's defenses. Plaintiff need not establish a discriminatory intent on the part of defendant. *See Pushkin v. Regents of Univ. of Colorado,* 658 F.2d 1372, 1384 (10th Cir.1981).

### III

Concluding that plaintiff has made a *prima facia* showing, the Court shifts the burden of persuasion to defendant to show that either he reasonably accommodated plaintiff's handicap or that it was not possible to reasonably accommodate the handicap without undue hardship on the Postal Services operations. *See Carter v. Bennett,* 651 F.Supp. 1299, 1300–01 (D.D.C.1987), *aff'd,* 840 F.2d 63 (D.C.Cir.1988). *See also Barth v. Gelb,* 2 F.3d 1180, 1183 (D.C.Cir.1993) (discussing burden shifting).[10]

Thus, we reach the crux of this action, that is, whether, when the evidence is viewed

---

**9.** As will be discussed below, the Court agrees that at some later point in time plaintiff's condition belied any promise that plaintiff could be a productive employee. Certainly by 1989, when plaintiff took disability retirement, it was reasonable to conclude that plaintiff was not fit for duty even in the Rehabilitation Unit.

**10.** Here again, the EEOC has issued regulations which provide that:

(a) An agency shall make reasonable accommodation to the known physical or mental limitations of a qualified handicapped applicant or employee unless the agency can demonstrate that the accommodation would impose an undue hardship on the operation of its program.

(b) Reasonable accommodation may include, but shall not be limited to: (1) Making facilities readily accessible to and usable by handi-

capped persons, and (2) job restructuring, part-time or modified work schedules, acquisition or modification of equipment or devices, appropriate adjustment or modification of examination, the provision of readers and interpreters, and other similar actions.

(c) In determining pursuant to paragraph (a) of this section whether an accommodation would impose an undue hardship on the operation of the agency in question, factors to be considered include: (1) The overall size of the agency's program with respect to the number of employees, number and type of facilities and size of budget; (2) the type of agency operation, including the composition and structure of the agency's work force; and (3) the nature and the cost of the accommodation.

29 C.F.R. § 1613.704.

in its entirety, defendant reasonably accommodated plaintiff's handicap?[11] Although less than thrilled with the overall conduct of the Postal Service and the handling of this matter, the Court concludes on the basis of the entire record that plaintiff was reasonably accommodated.

It must first be noted that plaintiff does not allege that she was entirely un-accommodated. It is undisputed that plaintiff received the Review Clerk assignment in the Rehabilitation Unit—along with its restricted physical requirements and other special accommodations. Moreover, the record demonstrates that plaintiff received work-schedule accommodations as a result of her alleged back problems—including, at various times, part-time duty (four hours per day) and leave without pay when she was unable to work and had no leave available. In fact, plaintiff remained on leave without pay for an extended period after she left her job in 1986 through her disability retirement in 1989.[12]

Instead, plaintiff contends that defendant's failure to provide her with the chair of her choice—the "orange" chair—was unreasonable and that defendant has provided no valid reason for this action. More specifically, plaintiff contends that the "blue" chair that she was required to use in the Rehabilitation Unit caused her pain and discomfort and did not satisfy her doctor's specifications. She contends that this discomfort caused her to miss substantial periods of work. Because the "orange" chair was readily available, she contends that defendant's action represented a failure to reasonable accommodate her.

First, there has been considerable disagreement between the parties, and there was conflicting evidence at trial, over exactly what chair plaintiff was required to use in 1985 and 1986. Unfortunately, the actual chairs in question were not presented as evidence at trial. Nevertheless, the Court finds based upon the sum of the testimony and evidence, that the chair pictured in Defendants Exhibit # 1, or its equivalent, was the chair plaintiff was required to use during 1985 and 1986. The Court rejects as incredible plaintiff's testimony that the chair depicted in the exhibit was not the "blue" chair in which she was required to work, as well as her testimony regarding the alleged characteristics of the chair in which she claims she was forced to work.[13]

Second, the Court finds that the "blue" chair pictured in Defendants Exhibit # 1,

11. The question is thus framed because it is inherently obvious that, if the question is narrowly defined as one simply of whether providing plaintiff with the "orange" chair she allegedly preferred would have caused undue hardship on defendant's operations, plaintiff would certainly prevail. The chair was readily available and there is no evidence that it was a health or safety hazard to co-workers. Thus, the Court could not help but indicate during trial a level of frustration with the overly bureaucratic manner in which plaintiff's requests in this regard were handled. The Court realizes, however, that this failure to comply with this particular request does not conclusively establish that defendant's other actions did not satisfy the requirements to reasonably accommodate plaintiff under the Rehabilitation Act.

12. It appeared at trial that plaintiff was attempting to argue that defendant was obligated to reasonably accommodate plaintiff by giving her a preference in her bids for an assignment to a position as an Information Clerk—a position for which she was almost certainly qualified but which was awarded to other employees based upon seniority. Plaintiff has now conceded, as she must, that defendant was under no obligation to award plaintiff any such preference. *See Buckingham v. United States*, 998 F.2d 735, 741

(9th Cir.1993) (employer not required to contravene rights of others to accommodate a handicapped individual); *Carter v. Tisch*, 822 F.2d 465, 467 (4th Cir.1987).

13. Plaintiff would have the Court believe that the employees in the Rehabilitation Unit were expected to work in chairs something akin to beach chairs. These chairs, she alleges, had a canvas back and seat which would substantially sink when plaintiff would sit upon it. The result, plaintiff contends, is that her knees remained higher than her buttocks and that her feet were unable to touch the floor.

While not foreclosing the possibility that the Postal Service might not provide the most appropriate equipment for its employees, the evidence simply does not support a contention that the Postal Service would expend the effort to create the Rehabilitation Unit for employees suffering from back ailments, with all of its concomitant accommodations and limitations, only to so callously disregard the special needs of the employees in the unit by providing such patently inadequate equipment. Instead, the evidence establishes that special chairs were provided for the unit—chairs provided precisely to address the limitations of the employees in the unit.

and in which plaintiff was required to work, was specifically acquired, after consultation with medical personnel, based upon their orthopedic characteristics. The evidence indicates that these chairs were purchased because management agreed that chairs with back supports should be provided to all employees in the Rehabilitation Unit. Moreover, because these chairs were medically recommended for individuals needing back support, the Postal Service established a policy that required their use by all employees assigned to the Rehabilitation Unit.[14]

Third, the Court finds that the "blue" chair had both a firm seat and back, and that it was constructed of steal or iron piping with a cloth covering. The Court also finds that the chair was an appropriate height for work at the modified cases in the Rehabilitation Unit, and that the chair provided back support to its occupant. In short, the Court finds that the chairs were orthopedically sound.

Fourth, the Court finds that although plaintiff's doctor, Dr. Azer, issued a number of medical certificates for plaintiff during the period in question, these certificates consistently indicated only that plaintiff needed a "chair with a back support." On only one occasion did Dr. Azer indicate that plaintiff should be provided a "rigid, high-backed" chair—and the meaning of that term is not medically apparent. Based upon these medical orders and the reasons for the policy established with respect to the orthopedic "blue" chairs in use in the Rehabilitation Unit, the Court finds that defendant was substantially complying with the medical orders presented by plaintiff's physician.

In sum, the Court concludes that under all the circumstances presented, defendant has met his burden of demonstrating that the orthopedic "blue" chair provided plaintiff, along with her assignment to the Rehabilitation Unit and the accommodation of her work-schedule, represented reasonable accommodations of her handicap. Plaintiff has failed to rebut defendant's evidence. *See Carter v. Bennett, supra,* 651 F.Supp. at 1301.

Plaintiff insists, however, that defendant was required to do more. Specifically, plaintiff relies on the fact that defendant refused to comply with her request that she be allowed to use the "orange" chair, which was otherwise available in the facility.[15] Although the Court agrees that a defendant is required to consider the individual and particular needs of a handicapped person, *see Langon v. United States Dept. of Health and Human Servs.,* 749 F.Supp. 1, 6 (D.D.C. 1990), *aff'd in part and rev'd in part,* 959 F.2d 1053 (D.C.Cir.1992), the mere fact that a particular request is refused is not dispositive.[16] While defendant was not free to sim-

---

14. The Court notes that this is not the first time that these "orthopedic chairs" have surfaced in litigation in this Circuit. In fact, it was the inability of a plaintiff to receive an assignment to the Rehabilitation Unit due to the lack of a sufficient number of such chairs that led to the complaint in a case decided by Judge Lamberth. *See Grist v. Frank,* Civ. No. 88–2129(RCL), 1990 WL 503647, 1990 U.S.Dist. LEXIS 17638 (D.D.C. Dec. 21, 1990). The Court there described the situation during late 1985 and early 1986 as follows: "The rehabilitation unit contained eleven orthopedic chairs which had been designated by USPS to provide continued gainful employment to employees who were medically certified as requiring a chair with back support." *Id.,* 1990 WL 503647 at *1, 1990 U.S.Dist. LEXIS 17638 at *1 n. 2.

15. This chair was depicted at Defendant's exhibit # 2. Although there was conflicting testimony, the Court finds that this chair had approximately the same seat height as the "blue" chair depicted in Defendant's exhibit # 1.

16. The question lingers, however: Why did defendant refuse plaintiff's request to use the orange chair? In light of plaintiff's continuing complaints, would it not have been simpler and more expedient to simply capitulate?

Based upon the Court's previous conclusions, it need not actually answer this question. The Court briefly notes only that in light of the special mission of the Rehabilitation Unit—to provide continued gainful employment of employees suffering from back ailments—it appears that the Postal Service should be given some leeway in establishing rules and regulations for those working within that Unit in order to achieve that goal. Specifically, the decision to require employees to use a particular orthopedic chair, right or wrong, appears to have been made in furtherance of this goal. That is, despite plaintiff's complaints, and apparently some complaints by others when the chairs were first introduced in the unit, the chairs appear to have been placed in service for the benefit of the employees and in order to keep them as healthy as possible.

ply ignore plaintiff's individual requirements and requests, neither was he required to merely accept plaintiff's preferences. *See Carter v. Bennett, supra*, 651 F.Supp. at 1301. Only reasonable accommodation is required. *Id.*[17]

## IV

The Court believes that the foregoing findings and conclusions are dispositive. For the sake of completeness, however, the Court will briefly address the following. Even had the Court found that defendant failed to reasonably accommodate plaintiff's handicap, the Court finds that plaintiff failed to demonstrate a causal relationship between the forced use of the "blue" chair and plaintiff's absences from work during 1985 and 1986. While it could be concluded, viewing all the evidence in the light most favorable to plaintiff, that plaintiff's discomfort with the "blue" chair contributed to her absences during this period, it is undisputed that her alleged back problem had caused her to miss substantial amounts of work long before the "blue" chair became an issue and that she would have missed substantial periods of work during this period notwithstanding the "blue" chair.[18] Thus, the Court believes that plaintiff failed to demonstrate that she was entitled to back pay for the 1985 and 1986 periods in question.

In addition, the Court finds that plaintiff is not entitled to any relief for the periods after plaintiff left the Postal Service in May 1986 and before her disability retirement in 1989.

Once again, plaintiff has failed to demonstrate a causal connection between the "blue" chair and her absence. Plaintiff's blanket claim that the "blue" chair justified her indefinite refusal to return to work is rejected. Most significant in this respect is the fact that the "blue" chairs in the Rehabilitation Unit were replaced by still another set of orthopedic chairs sometime after plaintiff left the Postal Service in 1986. Once again, although their was some dispute on this issue, the Court finds that plaintiff was aware of this change. Therefore, even if the Court had found that plaintiff was entitled to some recovery based on the "blue" chair incident, the Court believes it was unreasonable for plaintiff to continue to remain away from work after learning that the "blue" chair had been replaced. Moreover, here again the record indicates that there were other causes for plaintiff's absence after 1986.

Finally, the Court finds that plaintiff voluntarily elected disability retirement in 1989. The evidence is clear that plaintiff was not fit for duty as of 1989.[19] Thus, plaintiff was offered the option of disability retirement. While the Court may sympathize with plaintiff's predicament, the Postal Service was acting within its rights by informing plaintiff of her option to seek disability retirement or risk being separated from service. It follows, of course, that plaintiff's request for reinstatement is rejected.

## V

It is unfortunate that the noble purposes of the Rehabilitation Act are in a sense being

17. One final matter deserves brief consideration. The Court is indeed troubled by the apparent failure of defendant to comply with the January 24, 1986 EEO settlement in which plaintiff agreed to withdraw her July 27, 1985 EEO complaint in return for defendant's agreement to allow her to use the "orange" chair and to work in an area outside the Rehabilitation Unit. If defendant indeed refused to comply with this settlement, the Court does not condone that behavior.

However, a failure to comply with an EEO settlement does not establish a violation of the Rehabilitation Act. Moreover, the appropriate remedy for any such violation, as is clearly stated on the face of the settlement agreement itself, was the reinstatement of the complaint. Although the record before the Court is incomplete on this issue, it appears that plaintiff did not follow this required course.

18. The Court gives little credence to the testimony of Dr. Azer regarding the potential negative effect of sitting in the chair described by plaintiff. As noted above, the Court finds plaintiff's description of the chair she used is incredible. Thus, the facts upon which the Doctor based his assessment were invalid.

19. As noted above, Dr. Gordon's testimony raised significant doubts in the mind of the Court as to the actual condition of plaintiff's back. This does not alter the Court's conclusion, however, that plaintiff was unfit for duty at the time of her examination by Dr. Waugh in 1989. Plaintiff's own conduct and subjective complaints unquestionably supported Dr. Waugh's finding. In addition, Dr. Azer had indicated plaintiff was totally disabled commencing May 6, 1986.

trivialized by extensive and expensive litigation concerning two chairs which were not that different, one from the other. Nevertheless, the Court is faced with that fact situation and it must decide the matter. An Order and Judgment in favor of defendant and consistent with the foregoing is being contemporaneously issued herewith.